## W. J. RADNEY v. STATE.

No. A-5560.    Opinion Filed March 8, 1927.
(253 Pac. 913.)

See, also, 29 Okla. Cr. 318, 233 P. 770.

A. M. Stewart, W. M. Williams, and H. D. Henry, for plaintiff in error.

George F. Short, Atty. Gen., for the State.

DOYLE, P. J.   Appellant, W. J. Radney, was informed against for the murder of Eugene Lynch.   He pleaded not guilty to the charge, and upon the trial

the jury rendered a verdict of manslaughter in the first degree, but failed to agree on the punishment. In due course a motion for new trial was interposed in his behalf and denied, and he was sentenced to confinement in the penitentiary for a term of 20 years, and from the judgment duly pronounced by the court he appeals.

Appellant assigns error on rulings in the reception of evidence, and errors arising from the conduct of the trial judge, the conduct of the county attorney, and the conduct of A. R. Garrett, special prosecutor for the state.

At the outset it may be stated that a clear understanding of the facts in the case is the best explanation of some of the questions presented by appellant.

It appears that appellant lived on his farm 8 miles southeast of Mangum and a half mile west of the little town of Hester; that about 200 yards south of his home was a tenant house occupied by Mr. Yarber, who was the father-in-law of the deceased, Eugene Lynch. On Sunday morning, July 20, 1924, Leonard Radney, son of appellant, came to the Yarber home; he stopped at the gate about 50 feet in front of the house and asked one of Mr. Yarber's little girls to call Mr. Lynch out; she went to the house, and Mr. Lynch came out and engaged in a conversation with Leonard Radney, then he went back into the house. The elder Radney came down the road, stopped in front of the house, and said "Good morning" to Mr. Yarber, who was standing at the gate, and asked him where Eugene Lynch was. Mr. Yarber told him he was in the house, and appellant asked him to call him out; about that time Mr. Lynch passed the door, and appellant called to him, Mr. Lynch came out to the gate; after a brief conversation appellant pulled his gun, a 45-caliber Colt

pistol, and shot Mr. Lynch. The bullet entered about four inches from the spinal column on the right side, and, passing through the body, came out over the left nipple, the exit wound being four inches higher than the entrance. Mr. Lynch fell on his hands and knees, and then got up and ran to the porch and fell again, dying in a few minutes.

Buddy Yarber testified:

"I was standing at the north side of the gate, near Leonard Radney, when his father walked up, said, 'Good morning,' and asked me where Gene Lynch was. I told him he was in the house. About that time Gene walked in front of the door, and he called to him, and Gene came out. He said, 'Good morning,' to Mr. Radney, and Mr. Radney said, 'What is the matter with you and the boy?' Gene said there was nothing much, only the boy was trying to raise trouble with him, and he didn't want to have any trouble with him. Mr. Radney had his right hand on his hip, and he pulled his gun and shot him. Gene threw his hands up and said, 'Don't shoot,' or something like that. He fell, then jumped up, ran to the porch, and fell again. Mr. Radney and his son started away; we picked Gene up, carried him in, and laid him on the bed, and he was dead."

He further testified that the deceased was rubbing his hands in front of him when Mr. Radney pulled his gun and shot him; that the deceased was unarmed; and that there was no gun or pistol of any kind on the premises at the time.

On cross-examination, he was asked:

"Q. He and Mr. Radney's boy, Leonard, had been over in Kiowa county working at a thresher just prior to the difficulty? A. Yes, sir. They had been over there at work.

"Q. And during the time that Gene was at the thresher, his wife was staying at your house? A. Yes, sir."

244

Laura Yarber testified:

"I am 14 years old. I was out in the yard; Leonard told me to call Gene. I went up on the porch and called him; he came out and they stood at the gate talking, and I saw Leonard's father coming down the road. Gene went back in the house; then I heard Mr. Radney say, 'Gene, come here,' and Gene stepped to the door and said, 'Just as soon as I get my shirt on.' And he went out the door, putting his shirt in his pants; when he got to Mr. Radney he was rubbing his hands. I could not hear what was said; Mr. Radney pulled out his gun and shot him; my father was standing near the south post of the gate. Just as Mr. Radney pulled his gun Gene threw his hands up and hollered, 'Don't shoot me,' and fell. After the shot was fired Mr. Radney started to fire again, and daddy said, 'Don't shoot no more,' and Mr. Radney and Leonard turned and ran home."

Herbert Yarber testified:

"My age is 16 years. I saw Leonard Radney talking with Gene in front of the gateway that leads to the house; Gene came back in the house, and daddy went out to the gate. I saw Mr. Radney about halfway between his house and ours. He stopped in front of the house and said, 'Gene, come here,' and Gene said, 'All right, when I get my shirt on.' When I heard the gun fire, I looked and saw Gene fall on his hands and knees. He got up and ran to the porch; and daddy, mamma, and my sister picked him up, and took him in, and laid him on the bed."

Ettie Yarber testified:

"I saw Leonard Radney out at the gate; my son-in-law was going towards him; he remained out there just a few minutes, came in and went to the dresser and combed his hair; then I heard Mr. Radney call, 'Gene.' His wife brought his shirt, and I helped him put it on; then he went out to where Mr. Radney was. I was getting the children ready for Sunday school, I heard the shot and saw him fall. He jumped up and

came running to the house all bent over; I reached for him as he fell on the porch, and I fell down."

Lennie Lynch testified:

"I am the widow of Eugene Lynch; my age is 17 years. I was staying at my father's while my husband was working at the thresher over at Lone Wolf. I had been there but two weeks. My husband returned on the Friday before he was killed on Sunday. A few minutes before he was shot I saw him talking to Leonard Radney; in a few minutes he came in the front door and went to the dresser, combed his hair, and asked me to hand him a shirt. I brought his shirt to him. About that time Mr. Radney called him, and he said, 'All right, in a minute.' He did not own a pistol and did not have any pistol about him at the time when I heard the gun fire. I looked around and saw him fall; I started to him; he jumped up and ran to the porch."

For the defense Dora Radney, wife of appellant, testified:

"I was sitting on my back porch shelling peas for dinner that morning; my husband was helping me. My little girl said 'Mamma, Leonard is not going to Sunday-school, he is down at Mr. Yarber's.' I looked that way and saw Eugene Lynch striking towards my son; my husband got up and went through the house and then walked out. I had a conversation with my husband Saturday evening and told him that Leonard told me that he had trouble at the thresher with Eugene Lynch; that Gene called him a 'little bastard' and a 'little devil,' and that he kicked him and told him not to tell his father about it; that if he did he would get him; and that he came home Wednesday night because he was afraid to stay there. Leonard had told me these things Saturday morning."

Leonard Radney testified:

"My age is 20 years. I worked at the thresher over in Kiowa county. Eugene Lynch worked there at the same time; we bought a blanket together and I

paid for it; he was to pay me as soon as he got the money; we went to a picture show together, and I loaned him 50 cents. Tuesday night I was sitting by the threshing machine; he broke off a piece of inner tube and commenced tapping me with it; I told him to stop and he didn't; I got up, and he quit and said, 'I will see you later.' When we went to the barn together to go to bed, he reached back and caught me by the collar and said, 'You God damn little bastard. I told you that I would get you this evening and I am going to do it.' I said, 'Listen here, Eugene, you know I am not of age.' He said, 'Yes; if you ever tell your father about it, God damn you, I will get you; and if I don't, I have a brother just like me, and he will do it. Your father too, God damn him, I am going to get him too.' I worked until noon the next day and came home. I saw him Saturday morning. He owed me 50 cents, and I was going to town to get my trousers; I did not have any change so I sent my little brother down there with a note to get the 50 cents; he told him to tell me he didn't have the change, but would pay me in town that day. Then I told my mother about the trouble I had with him at the thresher; I saw Eugene in Mangum that Saturday. He came up behind me, put his hand on my back, and shoved me, and said, 'You know what I told you over at the thresher, don't you?' And he said, 'God damn you, you have been talking.' I said, 'I haven't said a thing.' He said, 'I know you have, you God damn little bastard; if you will go out of town with me, I will settle it just like I told you at the thresher.' And he said, 'Your father too, God damn him, he has been talking about me.' And he said, 'I haven't got the 50 cents, but if you want your God damn 50 cents come down in the morning, and I will have it for you.' I went down there Sunday morning and stopped in front of the house; Laura Yarber was standing there, and I told her I would like to see Gene; about that time he came out, and I asked him how he was feeling, and he said, 'God damn you, I feel just like I did yesterday. Here is the 50 cents, you God damn little bastard, it seems like you are worried about it.' I said, 'I didn't come down here for any trouble,

and he said, 'I know you didn't but you are down here and you are going to get it.' He struck at me once or twice, I stepped out of his way; he looked and saw my father coming and said. 'Yonder comes the God damnson of a bitch I want,' and turned and went back in the house. He had on his trousers and B. V. D.'s. Mr. Yarber came out about that time; in two or three minutes my father came there and asked Mr. Yarber what was the trouble, and Mr. Yarber called Gene out. He came out and my father said, 'What is the trouble with you boys?' And Gene said I had been trying to attend to his business. Father said, 'Forget all that.' He said, 'Hell, no; I don't forget nothing. You, God damn you, you have been telling lies on me,' and he said, 'Your wife, God damn her, she has been telling lies on me, and you, God damn you. I am going to get you right here.' And he went back to his side with his right hand; it didn't look like he got his gun clear out. I could see the gun. My father stepped back and fired the shot."

Several witnesses testified that they knew the general reputation of Warren J. Radney in that community as being a peaceable law-abiding man, that it was good.

The testimony of appellant in his own behalf was as follows:

"I came to Greer county in 1900; I have lived on my present farm of 240 acres 14 years; Mr. Yarber lived in the tenant house and Eugene Lynch lived in my house in Hester. Saturday night after we were in bed my wife said that my boy and Gene had some trouble over at the thresher, I asked her what it was. She said Gene had been whipping him with a piece of inner tube, that he hit him two or three times, and finally my boy said, 'By God, quit,' and Gene quit and said, 'I will see you tonight.' And when they went in the barn to sleep together that night Gene caught him by the shoulder and said, 'Do you remember what I told you? By God, I am going to do it,' that my boy said, 'Never mind, I am going to tell my daddy,' and Gene

said, 'If you do I will get you and him both.' That is what my wife told me. My son Leonard never told me about this until after the trouble; that the next morning I was shelling peas with my wife on the back porch, I looked and saw my boy and Gene Lynch standing in front of Yarber's and it looked like Lynch was striking at my boy with both arms; I got up, went into the house, and got my six-shooter and started to Yarber's; about halfway there I saw Eugene Lynch go into the house; when I got to the gate Mr. Yarber was there. I asked Mr. Yarber what was the trouble between Gene and the boy, he said he didn't know; I asked him was Gene there, and he called him out; as he came out he had his shirt about on; he looked like he was packing it down in his pants with his right hand. It looked like a bulk there, and he was trying to slip it down at his right side; I thought it was a pistol; I didn't actually see any pistol. I said, 'Gene, what is the trouble? What is the matter with you and Leonard?' And he said: 'God damn him, he has been talking about me.' I said, 'Gene, forget all that, I will make him behave himself.' He said, 'No; your God damn wife and you God damn sons of bitches have been talking about me, and right here I am going to get you.' As he said that, he made a grab at his pants and went to pull. Mr. Yarber said, 'Don't shoot'; when he did that I reached around and got mine. I stepped back about two steps and pulled my six-shooter from my left side. I had the hammer pulled back, and I shot; I did not see him fall."

On cross-examination, he was asked:

"Q. When were you married? A. February, 1909, at Altus."

In the rebuttal several witnesses, members of the threshing crew, testified that with Eugene Lynch and Leonard Radney and the other boys they engaged in a game of rap jack one evening with pieces of inner tubes, and that there was no difficulty that night between Lynch and Radney. Several other witnesses testified that they knew the general reputation of ap-

pellant in that community as being a peaceable, law-abiding man, and that it was bad.

From the foregoing summary it is plain that the verdict rendered is amply supported by the evidence, and that the judgment should be affirmed, unless some error of law requires a new trial.

Taking up the errors assigned in the order presented, appellant complains that the court erred in permitting the state to offer evidence in rebuttal, controverting the testimony of Leonard Radney, as to what happened, and as to conversations had between the deceased and Leonard Radney the night before Radney left the threshing crew.

As a witness for appellant his son, Leonard, was permitted to testify in detail concerning a difficulty had between himself and the deceased at the thresher. Included in his testimony were certain statements made by the deceased in the nature of threats against appellant. He further testified that he told his mother about the trouble that he had with the deceased and of the threats made by the deceased. His mother testified that she had informed her husband of what Leonard had told her about his difficulty with the deceased and of the threats made by the deceased. Upon rebuttal, the state called two or three witnesses who were present at the thresher. Each testified that evening the boys at the thresher all played rap jack, and during the game Leonard said to the deceased, "That is enough, by God, quit," and that the deceased with the other boys went on with the rap jack game. Oral Smith testified that he was with the deceased the rest of the evening, and he slept with him on his pallet in the barn that night, and that no threats were made by the deceased against Leonard Radney or his father.

The rebuttal testimony was objected to by counsel

for appellant upon the ground that it was impeachment on a collateral issue and of a transaction not in the presence of defendant.

The record shows that appellant introduced this collateral and irrelevant issue by offering evidence of the difficulty between the deceased and appellant's son in the absence of appellant. The state made no objection, but offered evidence to contradict the account given by appellant's son as to the details of the difficulty. That the issue as to the details of the difficulty between the deceased and appellant's son was collateral and irrelevant, we have no doubt. The question was not what actually occurred at the difficulty between the deceased and appellant's son, but the question was what did appellant's son tell his mother about it, and what did appellant's wife tell him about it? If her recital to him of what happened and of what the deceased said to their son was of such a character as to arouse his passion to such an extent that he armed himself with a six-shooter and went to the home of the deceased and there shot and killed him, as is shown by the evidence, then such recitals were competent evidence, both for the state and for the defense. Appellant could be actuated only by such things as he knew, and which had been communicated to him by his wife or others. Whether she gave a true or false account of the difficulty as told to her by her son is immaterial, as is also what actually occurred in the difficulty at the thresher.

The rule is well settled that, ordinarily, a party may not complain of an error which he himself has invited, or which he has waived, either expressly or impliedly. This rule clearly applies to a case where one party resorts to incompetent evidence without objections, and where the opposite party replies with evidence of the same character. In such case, both are

at fault and neither can complain in this court of the admission or exclusion of the evidence by the court below. 1 Wig. Ev. (2d Ed.) par. 15, p. 156; Id., § 19, p. 189.

In a homicide case, where the defense is justifiable homicide in self-defense, a defendant may for the purpose of showing the deceased to have been the aggressor introduce evidence to show that the deceased entertained hostile feelings towards him. Uncommunicated threats are evidence of the mental attitude of the deceased towards the accused. That is true also of communicated threats, and, further, evidence of the latter shed light upon the mental attitude of the accused towards the deceased when the homicide occurred. Wigmore on Ev., § 111.

In so far as the testimony of appellant's son tended to show statements by the deceased in the nature of threats against appellant, it was competent and the state was entitled to rebut the same.

Appellant also complains that the court erred in sustaining the state's objection to the testimony of the witness McCall, offered in corroboration of the testimony of Leonard Radney, as to the details of the difficulty between him and the deceased, on the streets of Mangum, the day previous to the homicide.

It follows from what has been said as to the previous difficulty between appellant's son and the deceased that the court did not err in sustaining the state's objection.

The final contention here made in behalf of appellant is that the court erred in overruling his objection to the question asked on cross-examination as to when he was married, and that the question asked and statements made to the jury in argument by Judge

A. R. Garrett, special counsel, assisting the county attorney in the trial, constitute prejudicial error.

Counsel for appellant in their brief say:

"The facts, as the testimony will show, are that Leonard Radney was 20 years old at the time of the difficulty, but that the boy's father and mother did not marry until 1909, which would tend to show that Leonard Radney was born out of wedlock, and such was the object of the special prosecutor, evident to the court and to the jury.

"The closing argument for the state, made by Hon. A. R. Garrett, hired counsel for the prosecution, clearly discloses the object that Mr. Garrett had in asking the question as to when the defendant was married."

Counsel for appellant requested that the closing argument by Judge Garrett, special prosecutor, be taken in shorthand.

The record shows his argument in part as follows:

" 'Vengeance is mine,' saith the Lord, 'I will recompense,' was the language of Moses 1800 years before that. But who is taking vengeance in this case? Who has taken upon himself to avenge? Yes; Warren Radney, in February, 1909, how old was this son of yours? He is 20 years old now and above—You say you were married in 1909—how old was this boy? When that boy went to his home and told his mother, whether he knew it or not, when he told her that this Lynch boy had called him a bastard—(interrupted)

"Mr. Stewart: Wait a minute! We object to this line of argument as not being in the case.

"Mr. Garrett: It is in the case.

"Mr. Stewart: And as being highly prejudicial.

"The Court: Overruled. The jury will be guided by the evidence.

"Mr. Stewart: Exception.

"Gentlemen of the jury, when that mother repeated that to her husband and this father that he had called him a bastard, this man with a fine farm; this man with a fine home; this man that can have bankers come in here, because he carries a bank account and banks with them, to testify to his standing; this man, who trades with the merchant princes of his town can have men come in here and testify for him; this man with his wonderful bank account, with a fine farm and a fine home, and being an officer, a member of the election board; this man—was that his justification, because this boy said Lynch had called him a bastard? Was that the thing uppermost in his mind; that the thing that stung; that the thing that cost Eugene Lynch his life?"

Generally speaking, when a defendant takes the witness stand in his own behalf, the right of cross-examination extends not only to the facts stated by him on his direct examination, but to all other facts connected with them, whether directly or indirectly, which tend to enlighten the jury upon the issues in the case.

The defense was that appellant, believing that he was in imminent danger and acting under that influence alone, fired the fatal shot.

A vast mass of testimony was introduced in this case. The transcript covers some 600 pages. The trial court allowed appellant's counsel full latitude in the matter of showing statements made by the deceased to appellant's son wherein the deceased repeatedly called him a bastard. It was the theory of the state that the defendant, when he armed himself and left his home and went to the home of the deceased, acted under the impulse of passion, engendered by his wife's story that the deceased had called their son a bastard, and that the motive on his part for the commission of the homicide was revenge. From what has been said

it follows that the question asked was proper cross-examination, and the objection thereto was properly overruled.

In this connection we do not think that the special counsel for the state was guilty of conduct that invaded the right of appellant to a fair trial. Counsel have the right to present to the jury their views of the proper deductions or inferences which the facts warrant.

This disposes of all the assignments of error discussed by counsel for appellant in their brief.

The instructions of the court, to which no objection was made or exception reserved, fully and correctly cover the law applicable to the case. In the conduct of the trial the court appeared to realize that appellant was in a defenseless position. On his own testimony the homicide cannot be justified, under the law. However, his counsel safeguarded his rights at every turn and spared no effort to save him from the consequence of his indefensible deed.

In conclusion, we find that the appellant had a fair trial, free from prejudice, and the judgment of the trial court is affirmed.

EDWARDS and DAVENPORT, JJ., concur.