## KATIE DAVIS v. STATE.

No. A-8916.   Oct. 25, 1935.
(50 Pac. [2d] 755.)

140

Charles R. Freeman, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J. By information, appellant, Katie Davis, and Ellis Eaton were jointly charged in the district court of McIntosh county with the murder of Jeff Davis, her husband, in said county on the 7th day of September, 1934, by shooting him with a pistol.

Demand for a separate trial was made and severance granted. The defendant Eaton, tried first, was convicted and sentenced to imprisonment for life.

Upon appellant's trial the jury found her guilty of murder and assessed the punishment at imprisonment for life. Her motion for a new trial having been overruled, she has appealed from the judgment entered upon such conviction.

The evidence shows or tends to show the following facts: Katie Davis, a full-blood Cherokee Indian, when about 16 years of age left her home to live with Ellis Eaton, a Cherokee Indian, and lived with him until Eaton left that country.

Katie's maiden name was Stop. After Ellis Eaton left, she returned to her parents' home near Tahlequah, where a child was born to her; this child lived but a short time. On July 22, 1926, she married Jeff Davis, a full-blood Creek Indian, about 60 years old, a widower and father of several grown children. Jeff Davis was a man of considerable property. Shortly after his marriage to Katie Stop, he made a will, devising to her all his property, including approximately $18,000 in cash, except the sum of $1 to each of his four children. Jeff Davis and his wife, Katie, lived in Checotah. Early in 1934, Ellis Eaton returned to his former home near Tahlequah, after serving a sentence in the California penitentiary. Shortly after Eaton's return, he and Katie began to associate with each other, whenever she visited her parents near Tahlequah. This association continued until the time of the murder of Jeff Davis and for a few days subsequent thereto. It appears that in July, 1934, Jeff Davis sued Katie for a divorce on account of her association with Ellis Eaton. This suit was pending at the time of the commission of this murder, although there is evidence in the record that Jeff Davis had asked that the suit be dismissed. In November, 1934, while this prosecution was pending, Katie Davis relinquished her right under the will to any of the estate of Jeff Davis reserving only her homestead right to her home in Checotah.

On September 6, 1934, Katie Davis and Ellis Eaton left Tahlequah, in Katie Davis' car, and drove out into the

country. Later that day they picked up a young man, Scott Bread, a cousin of Katie's, and about 4 o'clock in the afternoon they left that community and drove to Hulbert and Wagoner, and then in a roundabout way to the town of Checotah, stopping on the east side of town shortly before midnight. Ellis Eaton and Scott Bread left the car, Eaton taking a pistol belonging to Katie, and went to the home of Jeff Davis; there Ellis Eaton shot and killed Jeff Davis. Katie Davis remained in the automobile. After having killed Jeff Davis, Ellis Eaton and Scott Bread returned to the car and drove to the home of Ellis Eaton's sister at Knoxville, Ark.

The next day they returned to the vicinity of Tahlequah, where Ellis Eaton was arrested, and later Katie was arrested and placed in jail at Muskogee. At that time she denied any knowledge of the fact that her husband had been killed. She told the officers who questioned her that she, with Ellis Eaton and Scott Bread, had left Tahlequah about 4 or 4:30 Thursday and had arrived in Knoxville about 8 o'clock that night. This was the story they had agreed to tell while they were at the house of Eaton's sister at Knoxville. Later Katie made a statement to the county attorney of McIntosh county contradictory of the statement that she had made while confined in jail at Muskogee.

Scott Bread testified that he lives in Tahlequah, age 17 years, cousin of Katie Davis, lived with her and her husband at Checotah three years ago for about one year. Thursday morning about 10 o'clock saw Ellis Eaton and Katie at her father's house in Tahlequah and that afternoon about 4 o'clock they came to Tom Crittenden's place in Katie's car, a Ford V8, and took him to Hulbert, on the way stopping at Eaton's mother's place, then drove through

Wagoner to Muskogee, arriving there about 9 o'clock that night, had ham sandwiches and coffee, then drove to Checotah, went around the town on a dirt road, and stopped at the last filling station east of town. There Ellis Eaton got out and told witness to come along and show him where Jeff Davis lived. Then Eaton pulled a gun from under his shirt and stuck it in his belt. They walked along an old road to the house, and Eaton knocked on the door, Mr. Davis opened the door, Eaton spoke to him and walked in, Mr. Davis backed away, and witness started back to the gate, hearing a shot, ran back and looked in at the door; Eaton was standing with a gun in his hand and Mr. Davis was lying on the floor. Eaton came out and witness went back to the car with him, they got in and Eaton drove the car towards Gore, from there through Sallisaw to Fort Smith and on to Knoxville, Ark., arriving at Eaton's sister's home about day-light Friday morning. That when he got in the car that afternoon, Katie was drunk and when they returned from Jeff Davis' house she was asleep in the car. On the way to Gore, Eaton said, "I've killed me a man."

Appellant, Katie Davis, as a witness in her own behalf, testified that she was the widow of Jeff Davis; that along in 1920 or 1921, she lived with Ellis Eaton about six or seven months; failing to keep his promise to marry her, she went back to live with her mother; her age at that time was 16 years; that four or five months after leaving him her child was born, but did not live very long; that Eaton left and was gone for about eleven years; that in 1926 she married Jeff Davis and lived with him in Checotah until the time of his death. In July, 1934, he filed a suit for divorce, a week or two later she met him in Muskogee, they talked things over and he said, "We'll go on home together." That in April, while visiting her parents,

Ellis Eaton called at their home; stayed there but a few minutes. After that he would come there whenever she visited her parents, and she told him she did not want him around the place, that he ought to stay away; that her husband had given her a pistol for her protection; that she would stay with her parents two or three days, sometimes a week when her husband was away from home and would return to Checotah when he called her; that Eaton would come to the house and beg her to drive around town with him, that she always told him she did not want to go, that he would insist on her going, saying: "There ain't but one thing I know to do if you don't go with me. You come go with me or I'll get rid of you," and he would ask her to come and live with him again and she always told him she would not. Eaton told her he was going to have her or he was going to kill Jeff Davis, and she said, "I wouldn't hurt Jeff for nothing in the world."

That on Wednesday at 10 o'clock she left Checotah and drove to the home of her parents and that afternoon drove to the Ford garage and paid a bill and came out and found Ellis Eaton in her car; that she asked him to get out, he would not so she drove to the north part of town and left him there, and returned to her father's. The next morning she drove downtown to a store and when she came out found Eaton in the car, he asked her where she was going and she told him she was going home to Checotah, he said, "Get in the car I'll drive you over to your Dad's house"; when she got in the car he drove out of town two or three miles and stopped the car and forced her to take four or five drinks of liquor, and that is all that she remembers; that she does not remember driving through Hulbert or through Wagoner; that she remembers stopping some place, Muskogee or somewhere else, but does not remember going through Checotah, and does not re-

member Eaton and Bread getting out of the car or coming back; that the next thing she remembers was stopping at Eaton's sister's place in Arkansas just about daylight; that she was sick all day Friday and begged Eaton to bring her back. Eaton was reading a newspaper that day, and called his sister and said, "There is the man that he had killed," then she saw it in the paper and she said, "What in the world made you do such a thing?" and that was the first time she knew anything about him killing Jeff.

On cross-examination she stated that she never did tell anybody that Eaton had threatened to kill her husband, because she did not think he meant it; that she had received letters from Ellis Eaton and had written letters to him once or twice. She was then handed a letter and asked what it was and answered, "I wrote this letter," and against objection the letter was admitted in evidence and read to the jury, as follows:

"State's Exhibit C

"Checotah, Okla., May 8, 1934.

"Dear Baby, I have good news to tell you when ever I see you. I no you like the plan we have and hope So anyway. But if I don't come over this week I will be there first of the week Why I Said that We have Some Bill We got to pay by the 10th any way. I don't want to move on Friday like you told me and I will look for letter from you Soon. I Sure do get lonesome Baby Say Baby will you addresses an letter in care of Mrs. Joe Golden in My Name please Because I may be gone Some these days when I received your letter. Someone may See. So please, Honey. I Still love you as all way.

"From your love one Katie To my Baby

Ellis Eaton

"Ans Soon Baby

"E Gentry is the Sreet I have told you."

On redirect she testified this letter was never mailed to anybody. Asked what does it mean or what did she have in mind when you say here, "I know you like the plan we have and hope so anyway," answered, "We had a plan to go to Seattle, Washington in October." "I had a plan to pick Ellis up and for him to drive and leave him up there to get him out of the way." "That is what I had in mind."

Appellant also admitted having made certain statements and admissions out of court on the 13th day of September, 1934, and stated she signed the written statement because the county attorney told her it would make it a lot easier on her. The material part of which statement is that she had been corresponding with Ellis Eaton and seeing him off and on for about two or three months; that she did not know whether or not her husband had made a will; that she was with Ellis Eaton nearly all day Thursday, the 6th, and Scott Bread got in her car down on the street in Tahlequah late in the afternoon and Ellis Eaton drove west to Hulbert then through Wagoner; that they stopped a little while at Muskogee, then headed for Checotah. Then stopped close to the last filling station on the east side of town and Ellis Eaton and Scott Bread went from there to Jeff Davis' house and she went to sleep in the car; that when they came back, Ellis Eaton said, "Let's go," and he headed towards Gore and Sallisaw and said they would go over to his sister's at Knoxville. They arrived at Knoxville about daylight, and stopped at Onawake Smith's, Ellis Eaton's half sister, and stayed there until Saturday morning; that she was drinking pretty heavy that day; that the first time she ever heard Ellis Eaton talk about killing Jeff was about two weeks before it was done, when they were out on the east side of

Tahlequah and she told him she would not hurt Jeff for nothing in the world, and he said that did not make any difference he was going to do it anyhow.

Some objections were made and exceptions taken to the rulings of the court in the admission of evidence.

It is insisted by counsel for appellant that the court erred in admitting in evidence the letter written by appellant and addressd to Ellis Eaton, which letter had never been mailed, nor delivered to, nor received by said Ellis Eaton; that said letter was therefore incompetent as tending to show that appellant had conspired with the said Ellis Eaton to effect the death of Jeff Davis, her husband.

On a trial for murder any evidence which fairly tends to prove a conspiracy between the persons accused to commit the murder and a motive for the murder is admissible.

A defendant who takes the witness stand in his own behalf waives his constitutional privilege of silence, and the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to circumstances connecting him with the crime. Harrold v. Territory, 18 Okla. 395, 89 Pac. 202, 10 L. R. A. (N. S.) 604, 11 Ann. Cas. 818.

In the case of Radney v. State, 36 Okla. Cr. 240, 253 Pac. 913, 918, this court said:

"Generally speaking, when a defendant takes the witness stand in his own behalf, the right of cross-examination extends not only to the facts stated by him on his direct examination, but to all other facts connected with them, whether directly or indirectly, which tend to enlighten the jury upon the issues in the case."

In Creek v. State, 16 Okla. Cr. 492, 184 Pac. 917, 919, this court said:

"When the defendant takes the witness stand in his own behalf, he is to be considered a witness for all purposes, and is subject to a proper cross-examination upon all matters material to the issues joined. If, on direct examination, he opens a certain subject for investigation, he cannot be heard to complain if on cross-examination questions are asked him, the answers to which would tend to limit, explain, or modify the testimony he has given in chief."

It is also insisted that the court erred in admitting in evidence "A purported confession of defendant Katie Davis."

It appears from the record that when the written statement signed by appellant was offered in evidence, counsel for appellant objected; the jury retired from the courtroom, thereupon appellant as a witness in her own behalf testified that she signed the statement in the office of the county attorney; that Miss Whybark, the office girl, was present and took down the statement, and Mr. Coodey was there and they told her to answer the questions and tell the truth; and that she read it before she signed it.

Mere admission of inculpatory facts is not necessarily a confession; when a person only admits certain facts from which the jury may or may not infer guilt there is no confession.

A statement, declaration, or admission made by one accused of crime, explaining suspicious circumstances, for his own defense from which the jury may or not infer guilt, is not a confession and does not come within the rule that confessions must be voluntary to be admissable. Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613; Edwards v. State, 58 Okla. Cr. 15, 48 Pac. (2d) 1087.

In this case it appears that appellant made the statement, not for the purpose of conceding that she was guilty of murder, or with any view to confess her guilt, but in the line of a denial—not an expressed but an implied denial. However, the instructions given by the court included the law of confessions, correctly stated.

Applying the foregoing rules to the questions here presented, we are of opinion that the trial court did not commit error in admitting in evidence the letter in question or in admitting appellant's written statement.

The remaining assignment of error is that "the court erred in refusing to grant a mistrial on motion of plaintiff in error."

It appears from the record that during the progress of the trial before calling the last witness, counsel for appellant asked the court to have the jury retire. The jury being absent, he called the county attorney as a witness and on examination he elicited the fact that some fifteen days prior to the commencement of the trial the county attorney and one John Taylor, then sitting upon the jury, had taken a deer hunt together in the state of New Mexico. On cross-examination the state showed that neither this case nor any other case then pending in the district court of McIntosh county was discussed between Mr. White and Mr. Taylor, while they were on the deer hunt or at any other time.

Counsel for appellant being duly sworn testified:

"My name is Charles R. Freeman, attorney for Katie Davis. At the time of the examination of the jury in this case, I did not personally know Mr. Taylor. Neither did I know that he had been so intimate with the county attorney as to be with him for ten days on a deer hunt down in New Mexico within the last thirty days. Had I

known this fact, I certainly would have stricken him from the jury. Now, in view of the foregoing, I move the court to order a mistrial in this case."

This motion was denied. Exception reserved.

It is contended that such action of the court was prejudicial error.

Sections 2996 and 2997, O. S. 1931, provide the general and particular causes for challenge to jurors in criminal cases.

Section 2998 reads as follows:

"A challenge for implied bias may be taken for all or any of the following causes, and for no other:

"First. Consanguinity or affinity within the fourth degree, inclusive, to the person alleged to be injured by the offense charged or on whose complaint the prosecution was instituted, or to the defendant.

"Second. Standing in the relation of guardian and ward, attorney and client, master and servant, or landlord and tenant, or being a member of the family of the defendant, or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or in his employment on wages.

"Third. Being a party adverse to the defendant in a civil action, or having complained against, or been accused by him in a criminal prosecution.

"Fourth. Having served on the grand jury which found the indictment, or on a coroner's jury which inquired into the death of a person whose death is the subject of the prosecution.

"Fifth. Having served on a trial jury which has tried another person for the offense charged in the indictment or information.

"Sixth. Having been one of the jury formerly sworn to try the indictment or information and whose verdict

was set aside, or which was discharged without a verdict, after the cause was submitted to it.

"Seventh. Having served as a juror in a civil action brought against the defendant for the act charged as an offense.

"Eighth. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror."

In the case of Queenan v. Territory of Oklahoma, 11 Okla. 261, 71 Pac. 218, 61 L. R. A. 324, and on appeal to the Supreme Court of the United States, 190 U. S. 548, 23 S. Ct. 762, 47 L. Ed. 1175, the respective appellate courts held:

"The right of defendant to object that a juror was disqualified because it appeared during the trial that he had been convicted of a felony, contrary to his statement on his voir dire, is waived by failure to raise the question until after verdict."

Under this rule the motion for a mistrial on the ground that the juror Taylor was incompetent was obviously intended to preserve the right, if any, as one ground of a motion for a new trial.

It will be observed that the challenge under consideration as ground for a mistrial does not come within the terms of the statute. The law tenders to a defendant a jury for the trial of his case, and by accepting the jury he waives any objection thereto for bias either actual or implied in the mind of any of the jurors.

The purpose of examination of a juror on his voir dire is to ascertain whether there are grounds for a challenge for either actual or implied bias; also to enable the defendant to exercise intelligently his peremptory challenges.

The competency of a juror is, under the statute, a question to be determined by the trial court in the exercise of a sound discretion. The discretion given, however, is not intended to deprive the defendant of his right of trial by an impartial jury, and the statute cannot be regarded as changing in any degree the essential qualifications which jurors must possess. Temple v. State, 15 Okla. Cr. 176, 175 Pac. 733.

We are of opinion that the juror Taylor was not shown to be incompetent or disqualified as a juror.

In the case of State v. Carter, 121 Iowa, 135, 96 N. W. 710, the Supreme Court of Iowa held "that the relation of attorney and client between a venireman and the county attorney is no ground for challenge in a criminal case."

In Decker v. Laws, 74 Ark. 286, 85 S. W. 425, it was held that the fact "that a juror is on friendly relations with one of the parties does not render him incompetent."

In Scott v. Rues, 26 Misc. 834, 56 N. Y. S. 1057, it was held "that a juror has had business relations with the counsel of one of the parties does not render him incompetent."

In the case of Mathews v. State, 19 Okla. Cr. 153, 198 Pac. 112, 113, this court held:

"The mere fact that a prospective juror is a depositor in the bank interested in the prosecution of the defendant will not disqualify such juror, where it is not shown that his business relations are such as might influence his verdict or cause the bank to oppress him or place him at the mercy of the bank."

It follows there was no error in denying the motion for a mistrial, nor was there error in overruling on this ground the motion for a new trial.

One of the grounds of the motion for a new trial was that the evidence was insufficient to justify or support the verdict, in that it fails to show that appellant conspired with her codefendant to murder her husband.

Our Penal Code, St. 1931, § 1808, provides:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

The statute abrogates the distinction between an accessory before the fact and a principal, and all who would be accessories before the fact at common law are to be charged, tried, and prosecuted as principals.

We have carefully considered all the testimony in the case, and we cannot resist the conclusion that the verdict was fully warranted by the evidence.

The instructions given by the court to which no objection was made or exception taken submitted the issue of murder and of manslaughter in the first degree and fully covered the law of the case.

A most careful review of the whole record satisfies us the trial was without material error.

A fair and impartial trial in which appellant's legal rights were properly respected appears to have been accorded to her.

The judgment appealed from is therefore affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.