**Kenneth Russell CARSON, Jr., Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**Nos. F–73–112, F–73–410.**

Court of Criminal Appeals of Oklahoma.

Dec. 3, 1974.

Rehearings Denied Dec. 17, 1974.

**500**

Wendell E. Wightman, Oklahoma City, for appellant in F–73–112 and F–73–410.

Larry Derryberry, Atty. Gen., Robert McDonald, Asst. Atty. Gen., for appellee in F–73–112 and F–73–410.

## OPINION

BUSSEY, Judge:

Appellant, Kenneth Russell Carson, Jr., hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Cases No. CRF–72–1798, CRF–72–1799, CRF–72–1800, and CRF–72–1801, for the crimes of Taking Indecent Liberties with a Female Child Under the Age of Fourteen (14) Years (21 O.S.1971, § 1123); Rape in the First Degree (21 O.S.1971, § 1114); Oral Sodomy (21 O.S.1971, § 886); and Robbery with Firearms (21 O.S.1971, § 801), respectively, with each and every charge being After Former Conviction of a Felony. His punishment was fixed at sixty (60) years im-

prisonment; twenty-five (25) years imprisonment; twenty-five (25) years imprisonment; and ten (10) years imprisonment, respectively, and from said judgments and sentences, timely appeals have been perfected to this Court.

For purposes of writing this opinion, the above stated and styled cases have been consolidated by Order of this Court dated June 3, 1974. Case number CRF–72–1799 was tried separately and when necessary to refer to an assignment of error in this case only, we shall refer to it as Case No. F–73–112. The charges in Cases No. CRF–72–1798, CRF–72–1800, and CRF–72–1801 were consolidated for trial by one jury through stipulation by the State and the defendant and reference to this trial will be as Case No. F–73–410.

This Court ordered an Evidentiary Hearing to be conducted in this matter as to the conduct of the preindictment lineup and the photographic identification that preceded the lineup. Findings of Fact and Conclusions of Law from that Hearing were attached to the record.

The facts, briefly stated, are that on June 16, 1972, at approximately 5:00 a. m., a man knocked on the door of an apartment located at 804 N.W. 25th Street, Oklahoma City, Oklahoma, which was occupied by Sammy Knight, Paula Knight, and Tammy Clark. Paula Knight was asleep in the bedroom with Sammy when she heard the knock. Tammy Clark, Sammy Knight's eight year old sister, was asleep on the living room sofa. Paula put on her robe, went to the front door, looked out its window, and with the aid of the porch light, saw a man she had never seen before. She opened the door to ask the man what he wanted, whereupon he shoved open the door and stuck a gun in her stomach. The intruder told Paula not to move or he would kill her. He asked Paula who else was in the apartment, and she told him that her husband and his little sister were there.

The intruder made Paula wake Sammy and then forced them into the living room where he jerked the electrical cords out of the television set and the stereo. (It was at this point that Sammy Knight testified he got a look at the defendant's face, as he was only about a foot away from him.)

Sammy and Paula were then taken back into the bedroom where Sammy was ordered to lie face down on the bed and his hands and feet were tied behind him.

Paula was then taken into the living room, disrobed, and sexually assaulted. After this, the assailant went to the couch, lifted Tammy and laid her on top of Paula. The testimony of Paula Knight then related that the intruder was doing something to Tammy—"I don't know what it was, but she started whining."

Tammy was next taken to the bathroom where both she and the intruder remained for several minutes. The intruder came out alone and had intercourse with Paula a second time and then returned to the bathroom remaining there with Tammy for three or four minutes. The intruder again came out of the bathroom, tied Paula's hands behind her, had intercourse with her, and forced her to participate in an act of oral sodomy.

The prosecutrix further testified that after the intruder had intercourse with her a fourth time, Tammy was brought back into the living room from the bathroom and laid on the floor next to her. The intruder then asked where Sammy's billfold was and upon being told, proceeded to the bedroom and removed the billfold from Sammy's pants pocket. The money was removed from the wallet which was then dropped to the floor.

The prosecutrix then testified that just as the intruder was leaving their residence, he stated:

"Don't you all make a sound or turn on a light because I am going to stand outside the door for five minutes and if you turn the light on I'll come back in and kill you."

Medical testimony presented at trial established that as of 10:30 the morning of

the incident, there was sperm present in the prosecutrix.

At trial, defendant asserted an alibi defense. In F–73–112, the defendant produced witness Dawn Batta, who testified that they were together on June 16, 1972, in their residence. In F–73–410, defendant produced witnesses to contradict the description given by the victims.

At trial, a discrepancy was brought out between the description given to police officers the morning of the incident and the actual physical characteristics of the defendant. Also, at trial, Paula Knight, Sammy Knight, and Tammy Clark identified the defendant as the intruder that had forced his way into their apartment on June 16, 1972. Testimony presented at the Evidentiary Hearing ordered by this Court (E. H. transcript 29, 30), indicated that the initial description given varied with that given by the witnesses when they were later interviewed.

■ Defendant asserts as error that there was improper conduct on the part of the trial court in Case No. F–73–410, in that the Court expressed that it would be necessary to complete the trial within the remainder of the week.

In looking to this statement by the trial court in its complete context, it appears that the statement was not coercive in nature, but served to notify the jurors of the possible length of the trial. As such, we find no merit to this proposition of error.

■ Defendant further asserts that there was error in the conduct of the trial (F–73–410) when the jury was forced to stay together in deliberation until 3:00 o'clock in the morning. This Court stated in the fourth paragraph of the Syllabus in Reed v. State, Okl.Cr., 335 P.2d 932 (1958):

"The length of time a jury is required to deliberate is within the sound discretion of the trial judge and his judgment is final unless there is a clear abuse of his discretion."

The record reflects no abuse of this discretion and, therefore, defendant's proposition of error is without merit.

■ Defense counsel requested that the rule of sequestration be invoked during the State's opening statement, in Case No. F–73–112. The trial court denied defendant's request, but granted the State's request to invoke the rule after finishing its opening statement. Defendant contends this is error.

■ Whether or not to invoke the rule of sequestration at all is a matter in the discretion of the trial court and not an absolute right of the defendant. Thompson v. State, 73 Okl.Cr. 72, 118 P.2d 269 (1941). The precise question here is whether it is an abuse of the trial court's discretion to wait until the prosecution's opening statement is completed before invoking the rule, over objection by defendant. We think not. As the Supreme Court of Idaho stated in State v. Lockhart, 18 Idaho 730, 111 P. 853 (1910):

"... While we think it would have been eminently proper to have excluded the witnesses prior to the statement by the prosecutor, we do not consider the action of the court an abuse of his discretion, and it certainly would not afford grounds for reversal."

As such, there was no error in the action of the trial court.

■ Defendant asserts error in that the trial court overruled objections to the opening statements of the State. This Court has held that the purpose of the opening statement is to advise the jury concerning the facts involved so that they are prepared for the evidence that will be presented. Ragland v. State, Okl.Cr., 404 P.2d 84 (1965). Also, in *Ragland*, supra, this Court stated that the early case of Shacklett v. State, 23 Okl.Cr. 4, 211 P. 1063 (1923) has consistently been followed. In that case, we stated:

"Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically

stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the opening statement, unless such unsupported portions of the opening statement were made in bad faith and were manifestly prejudicial."

From a careful consideration of the record before us, it is the opinion of this Court that the statements of the District Attorney were not such as would constitute bad faith or prejudicial error.

■ Defendant contends that the trial court committed reversible error when it excluded all testimony from Mr. Howard Devine, a polygraph examiner for the Oklahoma City Police Department. The court excluded Devine's testimony because one of the jurors·knew of his employment as a polygraph expert. To completely exclude a witness for the defense comes dangerously close to violating an accused's Constitutional rights of due process; however, in this particular set of facts, those rights were not violated.

■ The results of polygraph examinations are inadmissible in Oklahoma. Mullins v. Page, Okl.Cr., 443 P.2d 773 (1968). Mr. Devine admitted that he possessed absolutely no knowledge of this case other then the result of the polygraph examination he conducted upon the defendant. Since he knew nothing which would be admissible for Mr. Carson's defense, it was not error to exclude him from the stand. Had Mr. Devine possessed competent information in regard to this case, the juror's knowledge of his occupation as a polygraph examiner would not have been sufficient to support the exclusion of his testimony.

■ Defendant also asserts as error that the trial court improperly admitted testimony regarding the in-court identification of the defendant because the defendant was made to participate in a pre-trial lineup without benefit of counsel.

The record does not reflect that the defendant objected to the in-court identifications of the defendant by three witnesses, nor does the record reflect that the defendant at any time prior to, or during the course of the trial, made a request for an evidentiary hearing. In Bridgeman v. State, Okl.Cr., 496 P.2d 431 (1972), we held:

"In the instant case the defendant did not timely request an evidentiary hearing whereupon the trial court could ascertain if the in-court identification was based on an independent source sufficiently distinguishable to be purged of the primary taint of the illegal pre-trial identification. Absent his timely request in the trial court for·an evidentiary hearing, we are of the opinion that this proposition is improperly before this Court. . . ."

See also Anthamatten v. State, Okl.Cr., 506 P.2d 959 (1973).

The record reflects that the lineup complained of preceded a formal charge. In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the United States Supreme Court held that the explicit guarantees of the Sixth Amendment as to counsel are applicable only after the formal charge of a criminal offense. In the instant case, there had been no formal charges and, therefore, this proposition is without merit.

■ With or without counsel, the lineup must be conducted in such a manner as to prevent unfairness and to insure.that an in-court identification is independent in origin from the eyewitness confrontation at the lineup. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The Lineup Sheet (F–73–410, pg. 552) indicates that correct standards were followed in the makeup of the subjects in the lineup. It is further indicated that there was no suggestion as to any one participant in the lineup. The record further indicates that the basis for the in-court iden-

tification of the defendant was a direct product of observations during the commission of the crimes charged.

In identifying the defendant in the courtroom, Paula Knight testified (F–73–410, pgs. 23, 24):

"Q. What did you observe after you looked out behind the curtain and the shade?

A. There was a man standing inside the screen door.

Q. Did you observe his face, his facial features at that time?

A. Yes.

Q. Looked well enough that you could recognize this person if you saw him again?

A. Yes.

Q. From his facial features that you observed?

A. Yes.

Q. Did you take time or did you look at the other parts of his body very carefully at that time?

A. No.

Q. Could you recognize this person by his facial features if you saw him again?

A. Yes.

Q. Do you see that person in the Court Room today?

A. Yes.

Q. Would you point him out by where he is seated Mrs. Knight and what he is wearing in this Court Room?

A. He's setting over there in a yellow shirt and blue shirt.

Q. Where is he sitting?

A. Over there at that table.

Q. Indicating the defendant?

A. Yes."

Sammy Knight testified (F–73–410, pg. 121):

"Q. Now would you recognize this person if you saw him again Mr. Knight?

A. Yes.

Q. Do you see him in the Court Room today?

A. Yes.

Q. Would you point him out by what he is wearning and where he is seated in the Court Room?

A. He's sitting right over there (indicating) with a yellow and blue striped shirt and blue pants.

MRS. HIRST: Let the record reflect that the witness had identified the defendant in this case."

Tammy Clark testified as to her in-court identification (F–73–410, pgs. 269–272), as follows:

"Q. Would you recognize that man if you saw him again?

A. Yes.

Q. Tammy had you ever seen him before that night?

A. No.

Q. Have you ever seen him since that night?

A. Yes.

Q. Would you recognize him if you saw him?

A. Yes.

Q. All right now Tammy I would like for you to step down from the witness chair and I would like for you to look around this room here and see if you see anyone that looks like that man that came in there where Paula and Sammy and you were there that morning?

A. Right there (indicating).

Q. All right now does that look just like the man or do you think that is the man?

A. . . .

Q. Do you want to go up close and see if you can see that scar, all right now be seated again and I'll ask you some more questions. Tammy is that the man that came in and hurt you that morning?

A. Yes.

Q. Is there any doubt in your mind that that is the man?

A. No.

Q. Now Tammy you went to a line-up didn't you?

A. Yes.

Q. You know what that is now don't you?

A. Yes.

Q. That's where all those men stand in the bright lights and you sit back in the dark and you decide if that person looks like the person that you are looking for, right?

A. Yes.

Q. Did any of those three policemen at that line-up room try to tell you which man you ought to put your finger on and say it was the man that did that?

A. No.

Q. Was there anybody in that line-up that you thought that you recognized?

A. Yes.

Q. Would you recognize him if you saw him again?

A. Yes.

Q. Do you see him in the Court Room?

A. Yes.

Q. Would you point him out with your finger?

A. Right over there (indicating).

MRS. HIRST: Let the record reflect that the witness has identified the defendant in the first instance when she stepped down from the witness chair and has pointed her finger directly at the defendant in the second instance.

\* \* \*

Q. All right now Tammy when the officer, the policeman talked to you after the line-up, did he ask you if you recognized anybody?

A. Yes.

Q. Do you remember what you said to him?

A. No, I don't think so.

Q. In other words you don't remember the exact words that you used when he asked you if you recognized anybody?

A. No.

Q. Did you recognize anybody?

A. Yes.

Q. And is this the man over here that you have already identified?

A. Yes.

\* \* \* \* \* \*

Q. Tammy why didn't you tell the officers that day at the line-up that you were sure that it was him?

A. Because I was scared that he'd get out and get me."

The record further reflects that each of these identifying witnesses did not waiver in their certainty during intense cross-examination.

The lineup was preceded by a photograph showing and this Court recognizes that such a showing offers an opportunity for improper influence or suggestion. In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, at page 971, 19 L.Ed.2d 1247 (1968), the United States Supreme Court stated:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of

constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . ."

The record (F–73–410, pgs. 23, 24, 121 and 269–272) establishes that there was an independent origin to the in-court identification. The record (E. H., pgs. 24–26 and P. H. pgs. 141–144) further indicate that the photographic showing was not conducted in a manner so as to be suggestive or improper.

■ Defendant's next proposition of error concerns the testimony of Oliver Reed, a private investigator hired by defense counsel, in Case No. F–73–112. On cross-examination, the attorney for the State was permitted to question Mr. Reed concerning tapes he made of conversations between Paula Knight, Sammy Knight and Reed. Defendant contends that these tapes were a work product of his attorney and privileged information and that, therefore, the State's sole and exclusive purpose in questioning Reed about the tapes was to prejudice the defendant.

We disagree. The trial court was correct in allowing the State to ascertain whether the witnesses' testimony was based only on his recollection, or whether his memory had been refreshed by listening to the tapes of the conversation or whether his memory had been refreshed by reading typed transcripts of the tape (there is always the possibility of error being transmitted into a typed reproduction of a tape). As we stated in Williams v. State, 92 Okl.Cr. 70, 220 P.2d 836 (1950), in the first paragraph of the Syllabus:

"On cross examination of a witness, the party cross examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief or to test his accuracy, *memory*, skill, veracity, character, or credibility." [Emphasis added]

■ Defendant also asserts that he did not receive a fair trial due to the admission of evidence that was irrelevant, incompetent and immaterial. In Lung v. State, Okl.Cr., 420 P.2d 158 (1966), this Court cited with approval Hampton v. State, Okl.Cr., 407 P.2d 210 (1965), stating:

" 'It is the duty of counsel to raise, at proper time and in proper manner, all objections to the proceedings and save proper exceptions. When this is not done, they are treated as waived, and there are few exceptions to this rule.' "

Further, this Court stated in paragraph one of the Syllabus in Williams v. State, Okl.Cr., 373 P.2d 85 (1962):

"Errors to which no exceptions were taken will not be considered on appeal unless they are jurisdictional or fundamental in character."

This Court also ruled in Radney v. State, 36 Okl.Cr. 240, 253 P. 913 (1927), that:

"The rule is well settled that, ordinarily, a party may not complain of an error which he himself has invited, or which he has waived, either expressly or impliedly. This rule clearly applies to a case where one party resorts to incompetent evidence without objections, and where the opposite party replies with evidence of the same character. In such case, both are at fault and neither can complain in this court of the admission or exclusion of the evidence by the court below. . ."

A review of the record indicates that the matters complained of were either objected to with objection sustained, raised in the first instance on appeal by the defendant, or admitted without objection. It is the

opinion of this Court that there was no fundamental error in the matters raised without objection or over objection and, therefore, we find no merit to this contention of error.

Defendant also asserts that the trial court improperly overruled his Motion for Mistrial, which was made on the basis that inadmissible evidence of other crimes (child molestation and oral sodomy) were improperly brought before the jury in Case No. F–73–112.

Evidence of the child molestation and oral sodomy was introduced into the record in response to questions of, "After he did this, what, if anything, did he do?" In response to these questions, the prosecutrix hinted at child molestation and described in detail oral sodomy. All three events, the rape, child molestation, and oral sodomy, occurred during the two hours or less that defendant was in the prosecutrix's apartment. Both the child molestation and the oral sodomy were part of a series of continuing offenses and as such, are admissible as part of the res gestae.

The reason for the res gestae rule was stated by the New Jersey's Supreme Court in Robertson v. Hackensack Trust Co., 1 N.J. 304, 63 A.2d 515 (1949), as follows:

"[T]he admissibility of the proofs as res gestae has as its justifying principle that truth, like the Master's robe, is of one piece, without seam, woven from the top throughout, that each fact has its inseparable attributes and its kindred facts materially affecting its character, and that the reproduction of a scene with its multiple incidents, each created naturally and without artificiality and not too distant in point of time, will by very quality and texture tend to disclose the truth."

Defendant further asserts that it was error for the prosecutor to refer to rape in her opening statement in Case No. F–73–410. We are of the opinion that the rape was part of the res gestae and as such was a proper subject for comment for the same reasons as enunciated above.

We, therefore, find no merit to these assignments of error.

Defendant was convicted under 21 O.S.1971, § 886 in Case No. F–73–410, and asserts that this statute is so vague as to be unconstitutional. This Court has heretofore pointed out that a statute is not unconstitutional due to the fact that it is general in terms in circumstances where these terms convey an adequate description of the prohibited act or conduct to a person of ordinary understanding. The meaning of 21 O.S.1971, § 886 is disclosed through interpretation, usage, and application. Recent United States Supreme Court decisions have held that statutes, similar to the one under attack here, are not unconstitutionally vague. See Wainwright v. Stone, 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); Canfield v. State, Okl.Cr., 506 P.2d 987 (1973), cert. den. 414 U.S. 991, 94 S.Ct. 342, 38 L.Ed.2d 230 (1973); pet. for rehearing den. 414 U.S. 1138, 94 S.Ct. 884, 38 L.Ed.2d 763 (1974).

Therefore, we find this assignment of error to be without merit.

Defendant asserts that the closing arguments of the State in Case No. F–73–112 contained improper comments. It is first to be noted that only one of the comments complained of were objected to at trial. As we stated in Thompson v. State, Okl.Cr., 453 P.2d 314 (1969):

"It is fundamental law in Oklahoma that a defendant will not be allowed to lay [sic] behind a log and first urge an error on appeal when the objection could, and should have, been made at the trial."

The one objection made to improper argument (F–73–112 Tr. pgs. 502, 503) was sustained by the trial judge and the jury was admonished not to consider her comment (a reference to defendant's prior conviction) for any purpose other than as a factor affecting his truthfulness.

The defendant's prior conviction was brought out during the course of the trial and we note, for the record, that the Assistant District Attorney was commenting

on the defendant's prior conviction for the purpose of affecting his credibility and truthfulness only. We, therefore, find this argument is not improper.

 Defendant contends that the trial court erred in overruling his Motion for New Trial on the basis of newly discovered evidence in Case No. F–73–112. Defendant alleges that Paula Knight and Sammy Knight committed perjury at the trial when they testified they were married to each other.

 For the purpose of this opinion, we will assume that that allegation is true. Whether or not a Motion for New Trial on the basis of newly discovered evidence shall be granted is clearly within the discretion of the trial judge and this Court will not overturn the trial judge's decision unless that discretion is abused. See Walters v. State, Okl.Cr., 403 P.2d 267 (1965). We do not believe that this was an abuse of discretion.

In Ward v. State, Okl.Cr., 444 P.2d 255 (1968), this Court reasserted the rule that a Motion for New Trial upon the ground of newly discovered evidence is not sufficient where it only tends to discredit or impeach the witness for the State, and especially where it would not change the result of the trial. The defendant claims that because of the incorrect name and marital status given by the prosecutrix, he was unable to adequately investigate the case and defend himself. However, the record reveals that the defendant's investigator talked with the prosecutrix before the trial, both at work and at home. We, therefore, find this assignment of error to be untenable.

 Defendant contends that the verdict was not supported by the evidence. Most of the authority cited by defendant stands for the proposition that the uncorroborated testimony of the prosecutrix, if inherently improbable, will not support a conviction. However, in this case we are not dealing with uncorroborated testimony. Two witnesses besides the prosecutrix,

identified the defendant as the man who was in their apartment that night. Police were summoned immediately after the crime occurred and found the witnesses upset, the broken wires that Sammy had been tied with and the underpants of the prosecutrix lying on the floor. The prosecutrix was medically examined that morning and tests confirmed that she had recently had intercourse.

The remainder of the cases cited by defendant are distinguishable on their facts.

 There was a conflict between the testimony offered by the defense and that of the State, and a variance between the verbal description given by the State's witnesses immediately after the crime, and the actual appearance of the defendant. It is necessary to point out that the question before this Court is not whether we would reach the same decision as was reached by the jurors in the instant case. The question before us is was there competent evidence before the jury from which they could reasonably conclude that the defendant was guilty as charged. The determination as to whether the State's or the defendant's witnesses were to be believed, as well as whether the witnesses could verbally misdescribe and yet positively identify the defendant, are questions of fact for the jury. As we stated in Sholes v. State, 97 Okl.Cr. 158, 260 P.2d 440 (1953), citing with approval Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637 (1943):

" 'Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Criminal Court of Appeals will not interfere with verdict even [though] there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts.' "

A review of the record indicates that there was competent evidence presented to the jury to support a verdict of guilty. We, therefore, find no merit to this assignment of error.

**510**

For all of the above and foregoing reasons, the judgments and sentences appealed from are accordingly affirmed.

BLISS, P. J., concurs.

BRETT, J., specially concurs.

BRETT, Justice (special concurrence).

I concur that defendant's conviction should be affirmed, but I believe the punishment is excessive; and therefore, I believe, under post conviction procedures the judgments and sentences should at least be made to run concurrently. These charges should have been laid under the provisions of 22 O.S. § 404, as separate counts in one information. This is true under either the single transaction theory, or under the same evidence rule. The testimony and evidence offered at both trials was exactly the same; and allegedly, according to the testimony offered, the separate offenses occurred within a brief period of time.