ANNELER v. STATE.

No. A-11295.   March 14, 1951.

(229 P. 2d 238.)

A. E. Pearson, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J.   The plaintiff in error, B. C. Anneler, was charged jointly with Frank Harwell by information

filed in the district court of Oklahoma county with the crime of assault with a dangerous weapon, alleged to have been committed upon the person of Richard Holt on January 22, 1949. A severance was granted and Anneler was tried to a jury and convicted of the lesser offense of assault and battery, the jury leaving the punishment to be fixed by the court, who assessed the same at imprisonment in the county jail for a period of fifteen days and a fine of $100.

The charging part of the information reads:

"That is to say, the said defendants, in the county and state aforesaid, and on the day and year aforesaid, acting conjointly and together, then and there being, did then and there wilfully and feloniously and without justifiable or excusable cause, make an assault at and upon Richard Holt, with a certain dangerous and deadly weapon, to-wit: unknown, had and held in the hands of the said defendants, by hitting the said Richard Holt on the head and body with said unknown weapon as above described, and seriously injuring the said Richard Holt, with the intent to do great bodily harm to the said Richard Holt; contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma."

Appeal has been duly perfected to this court. The defendant assigns as error:

(1) That the trial court erred in overruling the defendant's demurrer to the evidence and in refusing to direct a verdict of acquittal; (2) Error of the court in the admission of incompetent evidence over the objection and exception of defendant; and (3) That the punishment assessed by the court was excessive.

The record in the case is somewhat lengthy, the state using ten witnesses in making out its case and one in

rebuttal, and the defense using seven witnesses. The first two propositions advanced will be treated together, and in an attempt at brevity, the evidence will be narrated for the most part.

In the beginning, it should be kept in mind that the defendant Anneler was an officer of the law, a constable, · as was his codefendant and that in making a lawful arrest (as where a person commits a public offense in the presence of the officer), the officer may use all necessary means to effect the arrest. Tit. 22 O.S.A. §§ 193, 196.

In the within case it seems to have been the contention of the state that the prosecuting witness Holt at the time of his arrest had not committed a public offense in the presence of the arresting officers, but that irrespective of whether the arrest was justifiable or not, that thereafter the defendant unjustifiably assaulted the prisoner with some kind of unknown and dangerous weapon by hitting Holt upon the head and body with it, all as set out in the information heretofore in part quoted.

The prosecuting witness, Richard Willis Holt, testified that he lived at 511 N.W. Seventh Street, Oklahoma City, where he had lived four years; that he considered Bristow his home from 1922 to 1944; that he had been arrested in Bristow a number of times for being drunk; and that in 1932 he served 90 days in the Tulsa county jail for selling whisky. Witness further testified that in the afternoon of January 21, 1949, he was picked up for being drunk by Oklahoma City police officers and placed in jail until 11 o'clock that night, at which time he was permitted to pay a fine and was released. He then took a bus to Twenty-Fourth and South Robinson (Capitol Hill) where he got in his car that

had been parked there, and then drove around the block to Britton's Cafe, saw two young boys whom he knew, Jimmy Bell and Arthur Blake, and on account of the streets being covered with ice and snow, asked them to ride with him out to the Port Club (located in the 3100 block of North Portland) to tell a friend of his about a job that he could get. Witness stated that at the time he had hurt his right arm cranking a motor, his arm was bandaged and he could not accept the job himself. He promised the boys accompanying him that he would take them home after visiting the cafe.

Witness swore that he arrived at Britton's Cafe between 11:30 and 12 o'clock, and reached the Port Club between 12:30 and 1 a. m. He was asked:

"Q. When you got there, what happened? A. I just drove up in the parking lot and stopped my car and got out and the boys got out on the other side of the car, and I just walked around the back and by the time I got back there up drove a car and throwed a light on us and two fellows got out and said, 'What's your name?' I said, 'Dick Holt,' and they asked these two boys with me what their names was, and they told them. They said 'Well, Dick, you better come and go with us, you are too drunk.' I said, 'All right, sir.' I started over to the car, I thought I'd better lock the car, I asked them, and they said, 'OK, lock it.' "

Witness stated that constables Anneler, Harwell and himself entered Anneler's car, after witness had locked his; that defendant told witness's two companions to go home where they belonged, and the officers took witness to Justice of the Peace Pinnick's home. He stated:

"We went inside and they put me up there in front of him, and they said, 'we got this man for drunk'; he said, 'How do you plead?' I said, 'I plead not guilty, I am not drunk', and that is all that was ever said."

Witness testified that thereupon the defendant hit him on the back of the head, knocking witness to the floor; that witness finally scrambled around and got to the door and tried to run and get away, but that the two. officers caught him, handcuffed him and dragged him back inside, and witness stated:

"Well, they said, 'Let's kill the son-of-a-bitch', and the justice of the peace, this man Pinnick, he said, 'Kill the dirty son-of-a-bitch' again, he said that himself right in his own court."

Witness stated that the officers placed him in their car and started towards town, not telling him what they intended to do with him, and that at Tenth street and May avenue he got the car door open and jumped out when the car was stopped at the intersection; that the officers jumped out and caught him, kicked him under the chin, stomped him in the back, and defendant hit him over the head with his gun; that witness called for help, saying, "Call the police," and saying, "Help, help, they are killing me." Witness disclaimed fighting the officers, but stated he tried to hold on to the car and keep from being put back in it. He stated with reference to resisting the beating:

"The only way I could, I just put my hands up over my head, I was laying down on my hands and knees, and I put my hands like that with the handcuffs on so they couldn't hit me right straight on the head I was under a kind of an oil sign out there and that was the only defense I had."

He stated that a uniformed officer appeared and he agreed to ride to town with him; that he was taken to the hospital and treated and to the county jail. A Dr. Borecky, jail physician, treated him the next morning at the jail.

Jimmy Bell testified that he was fourteen years of age, that he had been to a picture show with a chum, Arthur Blake, and was going to spend the night with him. About 11:30 or 12 o'clock on this night they stopped in at Britton's Cafe, which was near the picture show; that no beer is sold there; that they saw Mr. Holt, whom witness had known for a number of years, and they agreed to accompany him to the Port Club out on Portland, and that Holt first drove them to Blake's home so Blake could leave a suitcase, and Holt then drove out to the Port Club; that Holt did not act like he was intoxicated and that witness never saw him take a drink; that Holt never drove over 25 or 30 miles per hour on account of the icy roads; that when Holt and Blake and witness got out of the car they never had an opportunity to enter the Club. He stated:

"And the constables drove up in the car and shined the light on us and they both got out and come to us and asked our names, and they told Mr. Holt, 'You better come with us, you are too drunk to be out here', and then he went and locked his car."

Witness further stated that Mr. Holt was not staggering when he got out of his car and that he went willingly with the officers without any remonstrance; that the officers told witness and his chum to go home; that they just had 50 cents between them, but finally caught a ride with persons leaving the club, and who needed their cars pushed on the ice.

Arthur Edward Blake, age 19, testified substantially as had Jimmy Bell.

Glen Gray testified that he was 39 years of age, was a farmer and lived at 6800 North Santa Fe; that he got up at 2 o'clock the morning of January 22, 1949; that at May Avenue and Tenth Street he stopped at the inter-

section and that all of a sudden he saw some fellows get out of the car and two of them commenced beating up on the handcuffed one. He stated:

"And there was a guy on each side of him, and one of them was whipping him with something, I couldn't say what, I couldn't identify the object because it was in the dark and I was in my car, and it was bad weather. * * * Well, they knocked this guy down on the ground and one on each side of him and kicking him, and so I just pulled around and went on down to Tenth and Pennsylvania and there was an officer's car sitting there, and I stopped and told him."

He further testified that the man whom he later found out to be Holt was hollering for someone to call the police and that he was on the ground trying to cover his face with his hands.

Dr. Borecky testified that he was the county jail physician, that on January 22, 1949, he examined Richard Holt and that he had two lacerations on the outer surface of his left wrist and about three-fourths of an inch long, and one of them was closed with two silk sutures, and that he had a lacerated wound on the back of his head, in the scalp, about three-quarters of an inch long, apparently produced by some kind of blunt instrument. His right hip was bruised, right shoulder bruised, face and legs discolored, etc. This examination was made about 10 or 11:30 in the morning. The physician testified that Holt's breath at that time had an alcoholic odor.

Leslie Nicholosi testified that he operated a restaurant at Tenth Street and May Avenue, and that on the night of January 22 [morning] about 1:30 or 2:30, he noticed a man jump from a car and holler, "God help me, they are killing me, help"; that the man Holt said to him, "Do something for me." He testified to the officers jerking Holt down and his holding on to the stop

sign, and finally that Holt agreed to get in the car with a Mr. Lane and Officer Gibson, a uniformed officer. He estimated the commotion lasted 30 to 50 minutes.

Officer Lane testified that when they got Holt to the jail he could not stand up, but he did not know whether it was from injuries received or not.

Night patrolman Gibson testified that on the night of January 22, 1949, he was requested to go to Tenth and May where a man was crying for help, and that when he got there witness Holt was down on his knees hollering for help and to save his life; that defendant Anneler and a Mr. Harwell told him they had arrested Holt for being drunk; that Holt was in pretty bad shape and was very wet and there was snow and ice all around, and witness asked the defendant and Harwell to permit him to take charge and he and Officer Lane took Holt by each arm and asked him to go with them, and he readily agreed, and they had no trouble with him; that the handcuffs were tight and his hands had begun to swell, and they took him to the hospital; that this was agreeable to Anneler, and that the prisoner was hysterical.

On cross-examination witness was asked:

"Did Mr. Holt appear as if he had been intoxicated or under the influence of whisky? A. Well, to tell the truth he was in such a shape that I couldn't tell."

Charles Milton Holden testified that he lived in an apartment upstairs from where the commotion at Tenth and May took place; that he heard a man crying for help and looked out of his window and thought it was probably a drunk and went back to bed, but the commotion continued and he observed that two men were trying to put a man he later learned was Holt, in a car, and Holt was holding and trying to stay out of the car and was

yelling for someone to call the police. Witness finally dressed and went to the scene and saw the defendant pull Holt from a bank of ice and snow and Holt's head hit either a stop-sign post or the car. Witness further testified:

"One of them at one time said, 'Let the son-of-a-bitch lay there and freeze to death.' They got him up and tried to put him in the car, and once he had his hands on top and he got his foot on the running board and he was trying to push back, and one of them said, 'You son-of-a-bitch, you get in that car, or we are going to beat you to death.' "

Witness estimated that the commotion continued for about 45 minutes from the time they first stopped at the intersection until Holt left willingly with the uniformed officers.

This concluded the state's evidence. The defendant demurred and the court overruled the demurrer, and properly so, in view of the testimony which, if believed by the jury, indicated that the defendant had no cause to arrest the complaining witness Holt, and that the force used was unreasonable.

Theodore Abraham, a policeman of Bristow, Oklahoma, testifying in behalf of defendant, stated that he had known Richard Holt for 25 or 26 years, and that witness had been a policeman since 1939 and had arrested Holt for being drunk, and when they got to the jail, Holt held on to the door and witness had to beat his knuckles with his club to get him in jail. Witness had one fight with Holt when they were young men.

H. T. Gay, city marshal of Bristow, and an officer there since 1935, stated that he had arrested Holt a number of times for drunkenness and fighting. He admitted that Holt was not a dead-beat, but worked for the ice

company at Bristow for a long time, and did pipe-line work. He further admitted that only one time did he have any trouble with Holt on arresting him.

Jess C. Roberts, justice of the peace, Rural 3, testified that the case filed against Richard Holt by the defendant Anneler in Justice of Peace Pinnick's court was transferred to his court, and that he found Holt guilty of being drunk at the time he was arrested by Anneler. He stated that Holt had appealed the case.

Otis Haltom, state trooper, testified for defendant, stating that he was answering an accident call about 1:30 or 2 o'clock the morning of January 22, 1949, and stopped at the Tenth Street and May Avenue intersection about the same time defendant did, and that prosecuting witness Holt was calling for help from the car and then got out and started to run away but slipped down. Witness asked Holt what the trouble was, but he did not tell him, but kept yelling for help and saying they were killing him. Witness did not stay but about two minutes and went on to answer his call. He stated the defendant did not strike or kick Holt while he was there.

Elmore Pinnick, justice of the peace, rural district One, testified that about 1 o'clock the morning of January 22, 1949, Constables Anneler and Harwell picked him up and he went cruising with them. That at the Port Club they saw Holt staggering and stumbling around his car, and that "he could hardly navigate" and Officer Anneler arrested Holt for drunkenness and placed him in their car; that no one talked much on the way to his office, "only Mr. Harwell asked him a question or two and he mumbled something you couldn't tell what it was. He was just dopey or something, you couldn't understand him, and I think two or three different times he

mumbled something like he wanted to know what was the matter with him. or something that way. We didn't talk any, none of us, going over there, no trouble at all."

Witness stated that he and Anneler went into his office to prepare a commitment and Anneler wanted to 'phone, and they left Mr. Harwell and Holt in the car; that witness looked through the window and saw Holt running trying to get away, and Harwell after him and he caught Holt by the coat-tail and both fell on the ice, and that Anneler went to help Harwell and Holt commenced to holler for help and said his legs were broken and the officers lifted him but suddenly he threw both officers to the side, got on his feet and ran but slipped on the sidewalk, fell, got up and fell the second time. The officers then finally handcuffed Holt and he quieted down, and witness helped the officers get him in by the stove, and witness told Holt to behave and the officers would not hurt him; that he did not see the officers beat or kick Holt; that they soon left with Holt for the jail.

Frank Harwell testified substantially as Judge Pinnick. He further denied that Constable Anneler had a "sap" or struck Holt with a sap, pistol, or kicked him either at Judge Pinnick's or at the intersection of Tenth Street and May Avenue, but that, on the contrary, only such force was used as was necessary to subdue Holt at the times he attempted to run away. Witness denied that they cursed Holt, threatened or abused him.

The defendant, B. C. Anneler, testified substantially as Judge Pinnick and Constable Harwell, and specifically denied using more force than was absolutely necessary in effecting Holt's arrest and keeping him in custody. Defendant denied kicking Holt or clubbing him, denied owning or ever using a "sap" on any prisoner,

or mistreating persons whom he may have arrested. He claimed that Holt was intoxicated and commenced his yelling for help without any cause or provocation.

The state offered in rebuttal the evidence of Albert S. Roberts, who testified that he was formerly county jailer for Oklahoma county for over a year and that Constable Anneler brought in a great number of prisoners regularly and that many of them had black eyes and were bleeding and "so on and so forth." He did not know who inflicted the injuries, but he stated that he reprimanded defendant as to his treatment of a prisoner one time. Said he:

"He brought a man in and started to book him, and he was drunk and popping off, and I told him he was popping off, and I told him, 'fellow you are in jail, we are doing the talking, and you answer the questions.' So he settled down and answered the questions and I went ahead and booked him, and after I had finished booking him he started popping off again, and Anneler said, 'Didn't you hear the man tell you to shut up?' And he hit him across the kidneys with his sap and knocked him down."

Witness further testified that he told defendant that any time he brought a prisoner into the jail, "that when he got in the front door he was my prisoner and to keep his hands off him, and from that time on when he brought a man in and booked him he would bring the commitment and throw it down and turn around and walk out, and that's all the dealings I ever had with him in a case of this kind."

From the above we see that there was a sharp conflict in the evidence. The court under the record was compelled to submit the issues to the jury and record discloses that in his charges to the jury the trial court gave full and complete instructions on every legal phase of the case, without a single objection by defendant's

counsel, who failed to suggest any further or different instructions or changes in any of those given. See Tit. 22 O.S.A. §§ 196 and 193, setting out when arrests may be made without a warrant and stating an officer's rights where there is resistance.

We conclude that the jury was correctly advised of the duties and authority of an officer in making an arrest.

In Butler v. State, 87 Okla. Cr. 369, 198 P. 2d 221, 224, we said:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Criminal Court of Appeals will not interfere with verdict even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

Counsel contends that it was error to admit the statements of the state's rebuttal witness Roberts as to defendant beating a prisoner with a "sap" when he was being booked at the county jail, citing the recent case of Harris v. State, 88 Okla. Cr. 422, 204 P. 2d 305, 8 A.L.R. 2d 1006, wherein it is stated in paragraph three of the syllabus:

"When the state offers to prove other alleged offenses for the purpose of showing a common scheme, plan or unlawful intent, the proof must clearly come within the exception to the general rule; and where the offenses are wholly independent and no visible connection between them even though of the same kind, an objection by the defendant to the proof should be sustained. If the trial court is doubtful whether the alleged other offenses are admissible, he should resolve the doubt in favor of the defendant and refuse the admission of such evidence."

The statements by Roberts were admitted, of course, for the purpose of impeaching the statements made by the defendant Anneler on cross-examination that he had never had any trouble like this before and had never beaten up a drunk, never had a "sap" with him the night that he arrested Holt and did not even own a "sap."

In Holt v. State, 84 Okla. Cr. 283, 181 P. 2d 573, 575, we said:

"The admission of evidence in rebuttal is largely a matter addressed to the sound discretion of trial court and its ruling thereon will not be reversed in the absence of a showing that the court's action was a manifest abuse of discretion."

We have studied this record with a great deal of care, keeping in mind the rights and duties of officers of the law in making arrests, realizing that officers of the law are often called upon to use considerable force in order to keep some types of prisoners in custody after they have been placed under arrest, and that many inexperienced citizens are easily shocked on witnessing any kind of physical encounter, and are unable to give a very coherent or satisfactory account of what may have happened; and we are cognizant that often at the scene are friends of the accused who may not be in sympathy with law enforcement. But here there was competent evidence indicating that the defendant used more force than was reasonably necessary on the prosecuting witness Holt. There was evidence to the contrary, but the issues, as stated, were fairly submitted to the jury, and we find no legal grounds to interfere with the judgment rendered.

The case is affirmed.

BRETT, P. J., and JONES, J., concur.