Buck ENGLAND, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A-12011.

Criminal Court of Appeals of Oklahoma.

Nov. 3, 1954.

Borgman & McAnally, Guthrie, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James P. Garrett, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

The plaintiff in error, Buck England, hereinafter referred to as defendant, was charged by information filed in the district court of Logan County with the crime of grand larceny of wheat, was tried before a jury and convicted, but the jury being unable to agree upon the punishment, left the same to the court. The trial court sentenced the defendant to serve a term of two years in the State penitentiary. Appeal has been duly perfected to this court.

For reversal, it is first urged that the trial court erred in overruling the application of defendant for a continuance by reason of the court permitting the county attorney to endorse the names of additional witnesses on the information prior to trial.

From the record we find that the case was tried on May 7, 1953; that prior thereto and on April 24, 1953 the court entered an order permitting the State to endorse on the information the names of Clarence Layton, Jr., Clarence Layton Sr., and Glen Edmondson, as witnesses, and on May 6, 1953 the court permitted the State to endorse the name of C. C. Chappell as a witness.

The record further discloses that on April 21, 1953, one of defendant's attorneys filed an affidavit in the case setting out that the evidence of Clarence Layton, Sr., Clarence Layton, Jr., and "Beans" Jacobs

were material to his defense, and requesting that the court endorse on the subpoenas directed to said named persons an order for their attendance at the trial. Not only did defendant seek the attendance of the two Laytons as witnesses, but their names were endorsed some thirteen days prior to trial, as was the name of Glen Edmondson; and that a day before the trial the court permitted the name of C. C. Chappell to be endorsed on the information.

█ The defendant's application for a continuance was oral and not interposed until the case was called for trial and was based on the ground simply that such endorsements of witnesses raised new elements or issues, and that counsel could not properly defend with the testimony that they were prepared to offer. It is conceded that an application for continuance is addressed to the trial court's discretion and that such will not be disturbed unless an abuse of discretion is shown, but it is urged that the court abused its discretion.

It appears from defendant's motion for new trial, as well as his brief, that counsel attempted to discuss the case with Glen Edmondson, who had been brought back from McAlester where he was already serving a sentence on a different grand larceny conviction, and that Edmondson refused to discuss the case with them; that they also spoke to C. C. Chappell and that he told them he did not know anything about the case, and refused to talk to them.

█ Under the situation, it could not be concluded that the witnesses would ever discuss the case in more detail with counsel. It is not asserted that the endorsement of such witnesses came as a surprise, nor is it set out in what way the delay in endorsement resulted in injury to defendant and affected his substantial rights. If defendant was surprised by the endorsement of the witnesses in question on the information, he should have filed a motion for a postponement or a continuance, and should have set out the facts constituting such surprise and what evidence, if any, he could produce to rebut the testimony of such additional witnesses if the case should be postponed or continued. He had ample time to do this. We conclude that the court

did not abuse its discretion in refusing to grant a continuance. See 22 O.S.1951 § 303; Goodwin v. State, 68 Okl.Cr. 381, 99 P.2d 181; Paschall v. State, Okl.Cr., 252 P.2d 175; Dean v. State, 51 Okl.Cr. 138, 300 P. 319; Brant v. State, 53 Okl. Cr. 216, 9 P.2d 963; Shaw v. State, 53 Okl. Cr. 389, 12 P.2d 550.

The information charged that the defendant on or about September 7, 1952 did steal approximately 225 bushels of seed wheat, of the value of $475 from one Hugh O'Neal, in Logan County.

Hugh O'Neal testified that he lived on a farm located a mile and a half south and one mile west of Marshall; that he had approximately one thousand bushels of seed wheat stored in a round steel granary; that on September 9, 1952 he discovered 20 to 25 bushels of wheat on the ground at his bin, and there were truck tracks around the bin and in the field; that he immediately notified Mr. Jelsma, the sheriff of Logan County.

Witness further testified, over objections of counsel for defendant, that he was present at the preliminary hearing and that the defendant testified and admitted that he was present the night the wheat was loaded, and helped load it.

Sheriff A. H. Jelsma testified to going to the O'Neal farm, finding dual wheel truck tracks, and to being present at the defendant's preliminary and that defendant testified and admitted that on the night of September 7, 1952 he helped Glen Edmondson load the wheat in question, helped him hire a truck to haul some of his belongings from Logan County to Chelsea. No objection was interposed to this testimony, but the court admonished the jury: "I want to admonish the jury on one question. The defendant does not admit committing the crime by the way the question was asked, but he does admit being there at the time the crime was committed. Does the jury understand that?"

Clarence Layton, Jr., testified that he was twenty-one years of age, was a farmer, that on September 7, 1952 he was engaged in the trucking business, owning one truck and that one "Beans" Jacobs helped him. He said that about 3 p.m. on September 7,

1952 a man 'phoned· for him to come to town for·a hauling job; that he came into Chelsèa to ·a filling station his· dad operated, which was just across the street from one operated by the defendant; that his father told him that a· Mr. Edmondson was over at ·Buck England's station and wanted· to see witness; that he 'went to Buck England's station ·and a Mr.. Glen Edmondson ·wanted to rent his truck but he would not ·hire his truck out for others to drive; that Edmondson offered· him $75 to move some wheat for him and witness then agreed to go get his helper, "Beans" Jacobs, to ·assist in the moving. Witness stated that during the·conversation Buck England and a man named Dawes were present; that witness went to get Jacobs and some side boards for the truck, and when he got back to England's station Edmondson was gone, but came. back about 8 p.m., said that he was ready to go; that Edmondson and England got in·a car and·witness and Jacobs got in the truck and were to meet the car at the Sav-Mor Station at Perry; that they arrived about 1 a.m., that Edmondson and England were drinking whiskey; that Edmondson was to lead the way to his granary and later stopped the truck. Edmondson claimed he was having trouble with his wife and said he would go up to see if she was awake, that he did not want her to know he was getting his wheat and stuff,· because it would just cause more trouble; that England got in the cab of the truck and later Edmondson got on the running board, had witness turn out his lights· and they drove to a granary and Edmondson opened the door and started shoveling the wheat; that all four of them helped shovel; that it was about 2 or 2:30 at night; that he could see a house about half a mile from the granary.

Witness stated that when the truck was filled they drove to the highway and then to Stillwater, and on back to. Chelsea arriving about 9:30 in the morning. He stated that Edmondson paid him by check $75 for the hauling, but later wanted to sell him the seed wheat, so witness gave Edmondson back the $75 check and paid him $180 by check for the wheat, and placed the wheat in the grain bin of Layton, Senior. That when he purchased the wheat from Edmondson his father and Jacobs were present. That he had never seen Edmondson before, and only knew England by sight. Witness stated that he was charged jointly with the defendant with stealing the wheat, but the charges were dropped as to him at the preliminary.

Clarence Layton, Jr., testified that he operated a service station at Chelsea; that one Glen Edmondson 'phoned his station wanting to put his son's truck to work; that witness then 'phoned Layton, Jr.; that Edmondson stated he and his wife had separated and he wanted to move from Perry in Logan County to Chelsea. Witness further stated that his son later contacted Edmondson and witness saw Buck England and Edmondson get in a car and his son leave in his truck; that about 10:30 or 11 o'clock the next morning his son 'phoned him at his home and stated that Edmondson wanted to see him and wanted to sell him a load of wheat. That he needed seed wheat but the load was more than he wanted, and he and his son went in together and finally purchased the wheat for $180, plus the hauling of $75. His son wrote the check made payable to Edmondson for $180 and it was marked "For wheat". Counsel for defendant offered no objection to any of this evidence.

Glen Edmondson next testified, stating that he was an inmate of the State Penitentiary at McAlester and that he was then serving time for grand larceny, and had been convicted for grand larceny, a bogus check, and grand larceny. He stated that he moved from Logan County to Chelsea September 1, 1952; that he had known Buck England, the defendant, since 1946; that Buck and he had been buddies; that he and Buck were drinking at Buck's station and Buck was planning on, or was farming, and wanted to get some wheat to sow, and they drove around and tried to find a place. That they drove from Chelsea to Vinita, and then to Orlando. That was two days prior to the hauling of the wheat. That when they returned to Chelsea they commenced trying to get someone to haul the wheat, and called a number of places, using England's service station 'phone, one

call being to Claremore, and that the calls were charged to England's phone. No truck was available, so Buck suggested that witness go across the street and see Mr. Layton, which he did, and Buck cautioned him that he did not want Layton to know that he was in on the deal. That witness finally talked with Layton's son and tried to rent the truck but Layton, Junior would not rent it, but did agree for $75 to get the aid of his assistant and haul the wheat; that England rode with witness and they drove to Pawhuska and to Perry and then out to the granary; that he and Buck drank whiskey on the way; that the truck was parked up a road and he went out to see the granary, then came back and had the truck drive in and all four of them took turns shoveling wheat into the truck; that they got back to Chelsea about 9 or 10 the next morning and he gave Layton, Junior, a check for $75 for the hauling. That the wheat stayed in the truck and later in the morning he sold the wheat to young Layton and his father for $180 and the hauling check; that he cashed the check and gave the defendant England $90, as his share; that England knew the wheat was stolen. Witness further testified that a charge was then pending against him for this theft, and that he had not been promised anything by the officers and expected to be prosecuted. On cross-examination he stated that his confinement at McAlester was maximum confinement and that he was not eligible to be a trusty. As to the scouting around prior to getting the grain, on cross-examination the following occurred:

"Q. Now, Layton, Jr., testified that Buck stayed in the truck with him? A. That was after we came back from looking around. Me and Buck went around looking at these other granaries and these two boys in the truck waited for us there. Then after we came back Buck stayed in the truck and I went up the road by myself.

"Q. How did they know where to stay? A. We told them to stay there and we would be back in a minute."

Allen Fields, deputy sheriff of Logan County, testified that on October 28, 1952 he talked with the defendant at his service station in Chelsea and inquired of him whether or not Glen Edmondson had tried to sell him any wheat, telling him that some wheat had been stolen in Logan County, and that defendant denied knowing anything about it.

C. C. Chappell testified that he was present at defendant's service station when Deputy Fields questioned him about Edmondson, and the wheat, and that England denied knowing anything about it. Counsel for defendant objected to this testimony on the ground that the name of witness had been endorsed on the information only one day prior to trial. The objection was overruled.

The court overruled defendant's demurrer to the State's evidence and defendant testified in his own defense. He stated that about September 6, 1952 Glen Edmondson came to his station about 4 o'clock in the afternoon and wanted to hire a truck to move him from out near Perry to Chelsea; that witness recommended several persons who had trucks for hire and that Edmondson went in the station and 'phoned and 'phoned someone at Tulsa; that he left but came back about 6 or 7 o'clock and stated that he had hired a truck and wanted to hire witness for $15 to help him move, and finally agreed to pay witness $25 and he agreed to help, and that the Layton truck appeared about 8:30 and defendant rode with Edmondson in his car and Layton and helper rode in a truck. Witness admitted that he had met Edmondson about five years before, but claimed that he had not seen him until eight or ten days before this when he came in to trade. Witness stated that when they got out from Perry the truck stopped and he got out of the car and got in the truck with Layton and "Beans" Jacobs and Edmondson told them to wait there and Edmondson went up the road to see if his wife was asleep. That pretty soon he came back and said everything was all right and they then went on up there and loaded the wheat.

On cross-examination defendant stated that at the time he helped get the seed wheat testified to, he was planning to farm and was looking for some seed wheat,

but was not looking for the seed wheat he helped Edmondson haul. He denied scouting around with Edmondson to locate wheat, or planning to get the wheat they moved, but claimed that Edmondson told him he and his wife were having trouble and hired him for $25 to help him move. He admitted that after the wheat deal he purchased a butane tank from Edmondson, but stated that later he 'phoned the sheriff and found that the tank had been stolen.

Defendant admitted that Deputy Fields, accompanied by Mr. Chappell, stopped at his service station and that Fields asked him if Edmondson had tried to sell him a trailer load of wheat, and that he told them "that no one had tried to sell me a trailer load." Witness claimed that he might have told Deputy Fields that he knew that Edmondson did get a load of wheat in Logan County if they had waited long enough. He denied knowing that the wheat was stolen.

William T. Dawes testified for the defendant, stating that he worked on a pipe line and lived in Chelsea; that on or about September 6, 1952 he was at England's service station getting some gas and Glen Edmondson came up and went in the station to use the 'phone and that witness went in to use the rest room and that he heard Edmondson 'phoning around trying to rent a truck. That later, about 8 p.m., he was at the station again and young Layton and "Beans" Jacobs drove up in a truck. He was asked: "Q. Will you tell the court and jury what transpired at that time? A. Well, they drove up and asked Buck what the deal was, and he told them he didn't know, that they were supposed to move Edmondson. It wasn't long until they closed up the station and left." He did not remember whether Edmondson arrived before he left or not, but stated that none of them seemed to know where they were going.

The defendant rested and the State offered no rebuttal. The defendant renewed his demurrer, which was overruled.

■ It is contended that the trial court erred in permitting State's witnesses Hugh O'Neal and Sheriff A. H. Jelsma to testify as to certain testimony given by the defendant at the preliminary hearing where he admitted being present when the wheat in question was removed from O'Neal's granary. We have already noted in narrating the evidence of these two witnesses that no objections were interposed to such testimony, except as to O'Neal. We have often held that errors occurring at trial should be preserved by proper objections and exceptions, and that when this is not done, they are waived, unless the errors are fundamental. Barnett v. State, 41 Okl.Cr. 153, 271 P. 956; Franklin v. State, 71 Okl.Cr. 115, 109 P.2d 239.

But the court, as already pointed out, on its own volition admonished the jury that the testimony concerning defendant admitting that he was at the scene when the wheat was taken was not evidence of an admission that he committed the crime charged. When the witness testified, he admitted that he helped load the wheat but claimed that he thought it was the property of Glen Edmondson.

Counsel by way of cross-examination could have brought out any further evidence explanatory of the testimony heard by Mr. O'Neal and Sheriff Jelsma.

■ In the case of Jackson v. State, 29 Okl.Cr. 429, 432, 234 P. 228, 229, the defendant objected to the State proving by the county court reporter certain statements made by the defendant at the preliminary hearing. It was held that "It is a well-settled rule that any statements of the defendant relevant to the offense for which he is being tried is admissible."

■■ Defendant asserts that the court erred in permitting the County Attorney to cross examine him about the butane tank that he purchased from Glen Edmondson after the wheat incident. Defendant was asked if he had had any dealings with Glen Edmondson, and on answering that he had purchased a butane tank from him, was asked if he later discovered that the tank was stolen, and he answered "Yes"; and stated that he found it out by 'phoning the sheriff, and that following his 'phone call Deputy Sheriff Fields came to his place to talk with him. At this point objections were interposed to further questioning along that line. If the county attorney

by such questioning was attempting to show that defendant was involved in other crimes, he failed, by reason of the fact that officer Fields came to his place of business about the butane tank as a result of defendant calling the sheriff about the tank. The testimony was favorable to the defendant, and it does not appear that any damage was done thereby. Counsel must have thought so too, or he would not have waited until witness had been extensively cross examined on the subject before interposing an objection.

We note that defendant 'phoned the sheriff about the butane tank on or prior to October 28, 1952, the day Deputy Fields came to interview him in response to such call. The complaint in the larceny of wheat case was not filed until January 15, 1953, so that apparently, so far as the record in this case shows, the defendant must have set in motion the chain of events that culminated in the arrest of Edmondson, and apparently his own eventual arrest. But so far as the cross examination complained of is concerned, it constitutes the most favorable evidence for defendant that we discover in the record. We conclude that the error was harmless error, and not sufficient to work a reversal of the case. Tit. 22 O.S.1951 § 1068.

It is contended that the court should have sustained defendant's demurrer to the evidence because it is asserted that he was convicted on the uncorroborated evidence of an accomplice.

 Obviously Glen Edmondson was an accomplice. And although Clarence Layton, Jr., was originally jointly charged with the defendant, the record shows that the charge was dismissed as to him on preliminary hearing. There is not sufficient evidence in the record to show that Layton could be classed as an accomplice. However that may be, an accomplice's testimony need not be corroborated in every respect, it being sufficient if the corroboration is such that tends to connect the defendant with the crime. 22 O.S.1951 § 742. And corroboration may be by circumstantial evidence as well as by direct evidence. Woody v. State, Okl.Cr. 238 P.2d 367.

 From the evidence recited, including the testimony of the defendant himself, we find corroboration. The defendant denied that he knew the wheat belonged to someone else. But by reason of the surreptitious maneuvers admitted in reaching the O'Neal grain bin, the turning off of the lights, and the wasting of grain on the ground, and leaving around 800 bushels of wheat in the bin, should have put defendant on notice that something was wrong, and only a very naive person could have believed Edmondson's story about not wanting to awaken his wife, given as the reason for driving without lights on when entering the field. So prosperous a farm, claimed by Edmondson to have been operated by him and to be the then residence of his wife, was simply too fantastic for belief, in view of his surreptitious conduct.

The case of Brant v. State, supra, was a case almost identical with the present case. There we held that the circumstances of the matter corroborated the accomplice's testimony, and that the defendant's testimony in itself corroborated the accomplice. We so hold here. We think the evidence sufficient to support the verdict and judgment rendered.

 Defendant finally contends that he should be granted a new trial by reason of newly discovered evidence, consisting of an affidavit of one Ralph Burgess who was incarcerated in the Logan County jail and claims that State's witness Edmondson while in jail with him just prior to defendant's trial, told him that he could either clear or "stick" Buck England, and that England was not guilty of the offense.

The new evidence would be for the purpose of impeaching or discrediting the State's witness Edmondson, and we have held many times that a new trial should not be granted when the newly discovered evidence is cumulative or for the purpose of impeachment. Williams v. State, 92 Okl.Cr. 70, 220 P.2d 836; Hiatt v. State, 67 Okl.Cr. 372, 94 P.2d 262; McKissack v. State, 61 Okl.Cr. 65, 65 P.2d 1239;

Moreland v. State, 58 Okl.Cr. 292, 52 P. 2d 97; Cummings v. State, 57 Okl.Cr. 428, 48 P.2d 879.

By reason of the above, the verdict and judgment appealed from is affirmed.

JONES and BRETT, JJ., concur.