Eugene Wendell WALTERS, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A–13600.

Court of Criminal Appeals of Oklahoma.

June 16, 1965.

Mart Brown and H. A. Bud Carter, Oklahoma City, for plaintiff in error.

Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Eugene Wendell Walters, hereinafter referred to as the defendant, was charged in the District Court of Oklahoma County with the crime of Assault with Intent to Kill, After Former Conviction of a Felony. He was tried by a jury, found guilty of the lesser and included offense of Assault with a Dangerous Weapon, After Former Conviction of a Felony; and was sentenced to Ten Years in the penitentiary. From that judgment and sentence he has filed his appeal in this Court, alleging numerous assignments of error.

It will be necessary to outline the facts of the case, which will be lengthy—due to the voluminous, repetitious, and unnecessary testimony allowed to be admitted during the trial, and on the Motion for New Trial.

The defendant was being arrested on a complaint signed by his wife for Assault, and while enroute to the police station, pulled a gun on the police officer, hitting and striking him, causing the car to jump a curb and stop against a fence. The fight continued, and the officer was shot in the stomach but was able, with the help of a witness, to keep the defendant there until another officer arrived to disarm him.

Rex V. Barrett, the officer who was shot, testified that he had gone to 608 North Dewey on November 1, 1963, on orders from police headquarters to pick up Walters on a complaint signed by his wife in front of the station captain. That he could get no answer at the apartment, and was starting to leave when Officer Gay arrived. That Mrs. Walters and another lady drove up across the street and motioned to them to come and talk to them. She told the officers that defendant had beat her up, and that he was there in the apartment because his car was parked behind the building. They went back, knocked three or four times—yelling that they were the police and wanted to talk to him. The door finally opened, started to close again, and Officer Barrett stuck his foot in the door and pushed it slightly. They entered the apart-

ment and defendant was standing in the middle of the room. There was another man in the room, but he did not enter into the conversation. Then Officer Barrett told defendant that his wife had signed a complaint against him, and that it was nothing personal with them, but that he would have to accompany them to the police station and he could post a $20.00 bond and be released until such time as he had to appear in police court. The officer searched Walters and found a gun, later identified as a .38 calibre Owlhead pistol, and stuck it in the left front pocket of his trousers. Then the officers took defendant out of the apartment, walked him down to Officer Barrett's car, and placed him in the right side. Officer Gay then walked back to his car, at which time Officer Barrett took his own service revolver out of his holster, and put it in the middle of his stomach, under his belt. As he was preparing to start the car, he noticed the other gun in his pocket was uncomfortable and he removed it from his pocket and put it under his belt also, making two guns under his belt. He was just starting to pull out into the street, when he heard the defendant say, "I am going to kill you, you son-of-a-bitch". He turned and the defendant had a small calibre pistol pointed at his head. Defendant reached over and got the .38 Owlhead pistol from the officer's belt, and put the small calibre pistol back in his right front coat pocket. The officer testified he was trying to get the car stopped, and defendant reached over and got the officer's gun in his right hand; took the other gun and started hitting him over the head with it at least three times. The officer testified that he was able to knock the gun out of the hand that he was hitting him with. This was the .38 Owlhead that he had removed from the defendant earlier. The officer stated he then grabbed the barrel of the other gun (the officers service revolver), and that the defendant must have opened the door with his other hand, because the door came open, and they continued the struggle outside. The officer was still holding onto the barrel of the gun trying to keep from being shot. When they were approximately twenty feet west of the car, the defendant got the gun out of the officer's hand, and he testified as follows:

"A. Well, after—I had a hold of his right arm and he was on the west side of me and I was on the east side toward the car and he—I had my hand clamped on his right arm and that was the arm that had the gun in it but some way he got the gun in his left hand. Just how, I don't know. The next thing I knew it was over to my right a little bit and he shot me.

Q. Where were your hands at this time?

A. Well, both of my hands was on his right arm because that was the one that the gun was in."

And, further:

"A. After he shot me I begged him not to shoot me anymore and when the bullet first hit me it almost knocked me down and as soon as I could I grabbed him and we started scuffling there back to the car and he was still cussing me and saying I am going to kill you, you son-of-a-bitch and of course he was saying that prior to the shooting, too, and I was still fighting and actually I never did strike him, all I was doing was holding his arm trying to keep him from shooting me again. We were about 20 or 25 ft. west of the car when he shot me and we struggled back to the car, we struggled around the car there a little after I was shot and he still had the gun and I was still trying to get it, I had my hand on his right arm and we scuffled there around the car. At first we went back to the side of the car and scuffled around in back of the car and he leaned me up against the

back of the car and I remember that particularly because, well, it hurt real bad and then, one of us, I don't know which one, tripped the other one and we fell. We went down behind the car there between Dewey and the sidewalk and right there in the dirt and I was on top and I had, I believe he got the gun over in his right arm, I'm not sure which hand he had it in but whichever hand he had the gun in, I couldn't ever get to the gun but I had my knee on his arm and I was holding his arm so he couldn't shoot me again and the gun was kinda waving in the air and I was—even though I was still trying to get the gun, I never could get it and I was holding him down there trying to get the gun at which time I noticed about a middle aged man with a stick come out of the building there and he came up there and he told the Defendant, he said, 'Lay that gun down or I am going to hit you over the head with this stick' * * * Officer Gay, or a big officer came running south down Dewey there and he run up there and he could see the gun waving around and he stopped—the Defendant had his head on the ground and he stepped on the Defendant's head and his heel caught him right in the eye, at which time he put his foot on his head and he still had this one foot on his head and he kicked the gun with the other foot, the gun went scooting out across there. * *."

Mark Breed, a salesman for Lincoln-Mercury, testified that he was driving down Dewey behind the police car and witnessed the scuffle, he became frightened when he saw the gun, and went on down the street and parked his car, coming back and staying behind a telephone pole. He saw the other officer run up and disarm the defendant by kicking him in the head.

Sam N. Atkinson, employed at Mason Furniture Company in their repair shop on the west side of Dewey, or 511 North Dewey, testified that on November 1, 1963 he heard a commotion in front of the building and when he looked up he thought the car was coming into the building. He went to the door, and said he hadn't gotten it open when the car came to rest, which he could see through the window. He testified as follows:

"Q. Will you tell the Court and jury what happened?

A. When I opened the door and stepped out, I saw Officer Barrett and this fellow here scuffling over something which I could not see because Officer Barrett had his back to me and they kept tussling over something, they were trying to get a hold of it with his hand.

Q. Who was?

A. Officer Barrett, they got back into the lot and I could see one had a gun in his hand.

Q. Let me ask you this. As they came out of the car, you said they tussled how near the car?

A. Right against the car on the back end, on the right hand side.

Q. Would that be next to the fence?

A. Next to the fence, that is correct.

Q. Then, what occurred?

A. They kept tussling there and they got out on the ground a rolling and when they got approximately 16 or 18 feet from the gate was when they got back on their feet.

Q. Did you see a gun at this time?

A. I did.

Q. And, who had the gun?

A. This fellow right here, Walters.

Q. That would be the defendant, Eugene Wendell Walters?

A. That is right.

Q. And do you recall which hand the gun was in at that time?

A. At that time it was in his right hand.

Q. Then, what occurred?

A. When they got up, he kept telling him while they were rolling and tussling, he said, 'I'll kill you'.

Q. Who said that?

A. This Walters, he said, 'I'll kill you'.

Q. How many times did he say this, Mr. Atkinson?

A. As much as three times.

Q. Then, what happened?

A. Well, when he got back there and got a hold of Officer Barrett, had his right hand a holding it and he had it down to his side at the time. He reached back with his left hand.

Q. Who did?

A. Walters reached back with his left hand and he got the gun and pulled it around there and he said, 'Turn me loose or I'll kill you'.

Q. Where were you standing at this time?

A. Approximately about the distance, I was standing about half way between the building and the gate, where the gate, where you go in the gate. * * * Approximately 30 feet.

Q. In what direction was Officer Barrett facing at this time?

A. He was facing the west.

Q. Which direction was the defendant facing?

A. Facing the east.

Q. I hand to you what has been marked State's Exhibit 14 and ask you if you have ever seen this?

A. I have, if it is not this one, it is one identically the same.

Q. Would this be the gun that you saw the defendant holding?

A. That is correct.

Q. Then tell the jury what happened.

A. Well, when they got the gun with his left hand, he pulled it around and used this finger to pull the trigger, this fore-finger here and when he pulled the trigger he shot and the gun wasn't over two inches from his stomach.

Q. Where were Officer Barrett's hands at this time?

A. He had a hold of his right arm.

Q. Of whose?

A. The defendant's.

Q. With how many hands?

A. Both hands.

Q. Was Officer Barrett touching the defendant's left hand at all, when the shot occurred?

A. No, sir, it was free.

Q. Was he touching the gun?

A. No sir.

Q. Where were both of his hands at this time?

A. They had a hold of the defendant's arm, right arm.

Q. Then, what happened, Mr. Atkinson?

A. That stunned the officer and he kinda turned loose and backed up and then I ran back in the shop and when I came back up I run back and told the fellow there that there had been an officer shot there in the yard and when I came out they were standing. Just as I got out to this fellow was when the other officer stepped up.

Q. Where did you get this stick?

A. There was a one by two sitting there by the door there in the shop.

Q. When you got back outside, where was the defendant, Eugene Walters?

A. He was laying on his back on the pavement with his shoulders up on the curb just north of the driveway into the parking lot. * * *

Q. Where was Officer Barrett?

A. Officer Barrett was sitting down on his stomach with his hand holding his arm pinned to the ground.

Q. Whose arm?

A. The defendant's.

Q. Did you see a gun at this time?

A. Yes.

Q. And, who had the gun?

A. The defendant.

Q. What hand was the gun in?

A. It was in his right hand at that time.

Q. Did you hear the defendant make any other statement at this time?

A. No, I didn't.

Q. What happened then?

A. Just at the time I got there and all, I told him to turn the gun a loose or I would scalp him and the other police officer, he stepped in and put his foot on the side of his face, he moved his head and his heel slipped down over his face."

Mr. Atkinson further testified that the defendant had what looked like a mark over his right eye where he had his head facing south and Officer Gay put his foot and he moved and his foot slipped; and it looked like a bruised right eye. That Officer Barrett was pretty well bloody on his back side, and his face up over his left eye had a pretty nasty cut, and his face on that side was completely bloody.

Officer Gay's testimony corroborates the testimony of Officer Barrett and Mr. Atkinson. He further testified that the defendant told him "I shot the S.O.B. with his own gun".

Officer Robert McEwen also testified that the defendant made a similar statement, the only difference being the epithet used, when he was seated in the scout car with Officer Gay standing beside him.

Detective Kenneth Liles testified regarding the investigation made of the shooting, and testified regarding the statement made by Walters at the police station later in the day. That statement which was introduced as State's Exhibit #19, reads as follows:

"STATEMENT OF EUGENE WENDELL WALTERS, WM–37, 608 N. Dewey,

This statement is being taken in the Robbery Homicide Division of the Oklahoma City Police Department, in the Detective Bureau, on the second floor. The statement is being taken at 12:18, 11/1/63, in reference to the shooting of Officer Barrett, Occurring in the 500 block N. Dewey, at approximately 10:30 A.M., 11/1/63. This statement is being taken from EUGENE WENDELL WALTERS, wm–37, 608 N. Dewey. The statement is being taken by Officers C. Greeson and Jack Jordan.

Q. Eugene, do you understand that this statement you're about to give is given in your own free will, and that no threats or promises have been made to you in order to obtain this statement?

A. Yes.

Q. Eugene, I'm going to hand you this mike again, and tell us in your own words what occurred from the time that the officers appeared at your house and the time that you arrived here at the station.

A. Well, two officers knocked on the door and said they had a warrant for me, and they took me out, put me in the police car, and this wife of mine, the one that signed the warrant, her and this Lesbian girl friend of hers was sitting out there, and, evidently, she knew the officer, something or other, cause they were laughing and started down the street. I tried to talk to the man, told him that she had had me arrested nine times this year, and they passed us about a half a block from there and waved

at him. I don't know. We got in an argument and he taken his eye off the gun and when he did, well, we got to fighting and the police car ran up on the curb, and we fought in the car and fought out of the car, and I don't know, the gun went off, I pulled, *I remember pulling the trigger*. (Emphasis ours)

Q. Do you remember how many times you did—A. No.

Q. Pulled the trigger? A. No, I don't.

Q. Did the officer have a hold of the barrel, or did you?

A. Both of us had a hold of the handle.

Q. Both of you had a hold of—A. Yes—Q. The handle.

A. He was trying to shoot me, and I was trying to keep him from shooting me. He had already hit me in the eye with the damn things and I figured he'd gone far enough right there.

Q. At the time that the gun went off, was there anyone else present, any other officer?

A. There was no officer present, unh uh, After the gun went off, we was still fighting, I was trying to get away from the man, and I wasn't going to just jump and run when he had the damn gun in his hand.

Q. Did another officer show up?

A. Yes.

Q. Did you quit fighting then?

A. Yes, I quit fighting, let's see, another officer and a man, some man that's in business right there, or lived right there or something or other showed up. He had a club in his hand, about the same time the squad car showed up.

Q. *Do you admit pulling the trigger of the gun while you and the other officer were scuffling with the gun over—*

A. *Pulling the trigger, yes.* (Emphasis ours) * * *"

When the defendant took the stand to testify, his story was somewhat different. He stated that he was told to walk across the street and get in the car and that the officer did not place him there. He stated that the officers did not take a gun from him, that they did not search him at all. He said that the officer got mad and hit him in the eye with his gun while driving down the street, and that was how the fight started. However, one statement he makes in the above statement doesn't coincide with this story—he states, "He taken his eye off his gun and when he did, well, we got to fighting".

He contends that he was only trying to protect himself, that he only hit the officer with his fists, and that those blows with his fist caused the cuts and blood on the officer. When questioned closely regarding the actual shooting, the defendant's answers were "I don't know" or "I don't remember." He later stated that both he and the officer had hold of the gun when it went off. He admitted that he had been convicted previously in Tulsa County for Kidnapping and in Arkansas for the Dyer Act, and received suspended sentences for both offenses.

Defendant alleges some 25 assignments of error, but only argues 4 in his brief; the first being the verdict was excessive and appears to have been given under the influence of passion and prejudice.

Defendant contends that since the officer was making an illegal arrest, he was justified in shooting him, when (according to defendant) he would not let him go. He cites no case law to support this theory. The evidence concerning who was the aggresser was conflicting—naturally. The officer stated the defendant started the fight, and vice-versa.

■ There is an abundance of testimony to support the state's evidence, and that was a question of fact for the jury to determine under proper instruction. See, Gresham v. State, Okl.Cr., 396 P.2d 374.

Inasmuch as defendant was not convicted of Assault with Intent to Kill, but of the lesser offense of Assault with a Dangerous Weapon, it is not conceivable that the jury was prejudiced on this point or any other. The instruction given by the trial court on illegal arrest was certainly very favorable to the defendant.

This Court must remark on the method of arrest used by the Oklahoma City Police Department.

Title 22, O.S.A. § 196, provides the conditions under which an officer may arrest without a warrant:

"(1) For a public offense, committed or attempted in his presence. (2) When the person arrested has committed a felony, although not in his presence. (3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it. (4) On a charge, made upon reasonable cause, of the commission of a felony by the party arrested."

■ None of these conditions existed in the instant cause, and we shall assume that the arrest from its inception was illegal because no warrant had ever been issued, nor can the actual signed complaint be found.

However, this is the practice now employed by the police department—after the complaint is signed at the police station, the information for the arrest is transmitted to the scout cars, and the officers proceed to make the arrest.

Admitting that this arrest was illegal, and the routine practiced by the Oklahoma City Police Department is not in conformance with the Statutes of the State of Oklahoma, Officer Barrett was merely following orders from his superiors when making the arrest

of the defendant. Walters admitted he had been arrested at least nine times before on complaints signed by his wife in the same manner. He gave no indication that there was anything in this arrest to make it any different from the nine previous arrests to justify it being illegal in his mind at that time. This was not even mentioned in his statement given to the police as a reason for the attack on the officer. There is no evidence that either party started the fight because the arrest was illegal.

■ In the early case of Davis v. State, 53 Okl.Cr. 411, 12 P.2d 555, this Court stated:

"A peace officer is a trespasser when he attempts to arrest without a warrant for a misdemeanor not committed or attempted in his presence, and the person sought to be arrested may resist arrest."

And, further:

"The right to resist an unlawful arrest is limited and varies with the circumstances. If the official character of the officer is known to the person sought to be arrested, or if the officer informs him of his official character and his reason for the arrest, and the person sought to be arrested has no reason to apprehend any treatment other than detention, he is not justified in the use of a deadly weapon in resisting the arrest."

The statutes of the different states vary, but in general there is a uniformity in substance. The general rule is stated in 29 C.J. 1093, § 68, 40 C.J.S. Homicide § 19, p. 865:

"One, who in resisting a lawful arrest, intentionally kills a person seeking to arrest him is guilty of murder. * * * Even when an attempt to arrest is illegal, the killing of the officer with malice is murder. * * *"

To much the same effect is 2 R.C.L. p. 474, § 32:

"The law places too high a regard upon human life to justify the slaying of a human being in resisting a mere tres-

pass, and the deliberate killing of another to prevent an illegal arrest is murder. Williams v. State, 44 Ala. 41; Rafferty v. People, 72 Ill. 37; Anderson v. State, 133 Wis. 601, 114 N.W. 112; Roberson v. State, 43 Fla. 156, 29 So. 535, 52 L.R.A. 751; Muscoe v. Com., 86 Va. 443, 10 S.E. 534."

The facts in the case at bar are undisputed that the officers advised defendant who they were, and why he was being arrested. The fact that they did not have a warrant in their possession, or even on file at the police station did not justify the defendant pulling a gun on the officer and attacking him.

This Court would suggest that the better practice for the Oklahoma City Police Department to follow in future arrests to avoid any question or nullifying a conviction; would be for a Warrant of arrest to be issued after the complaint is signed. Further, some type of filing system should be set up either in the Municipal Court or at the Record Bureau for the preservation of these signed complaints.

■ This Court held in the case of Traxler v. State, 96 Okl.Cr. 231, 251 P.2d 815:

"When a person accused of crime is held under valid process in the proper forum, such detention is not rendered invalid because of the illegality of the events which preceded, or which made the detention physically possible. His wrong against the State holding him is not to be condoned because of the illegality of the means employed in obtaining custody."

And, in the very recent case of Allen v. State, Okl.Cr., 400 P.2d 463:

"Where an accused is physically before the court upon a criminal charge, either because he is held in custody after an arrest or because he has appeared in person after giving bail, the invalidity of the original arrest is immaterial as regards the jurisdiction of the court to proceed with the case."

And, further:

"The fact that an original arrest may have been unlawful does not affect the jurisdiction of the court, and it does not preclude trial of the accused for the offense."

Since the trial court gave the very liberal instruction on illegal arrest, this Court is of the opinion that the defendant received a more favorable light concerning said arrest than he was entitled to under the cases and law cited above.

■ Defendant's second proposition alleges improper rebuttal by the prosecution. It is clear from the record that the trial court sustained the objections of the defense counsel, and did not permit the prosecution to introduce much of the rebuttal testimony by Officer Barrett. This Court held in the case of Anneler v. State, 93 Okl. Cr. 437, 229 P.2d 238:

"The admission of evidence in rebuttal is largely a matter addressed to the sound discretion of trial court and its ruling thereon will not be reversed in the absence of a showing that the court's action was a manifest abuse of discretion."

There was no abuse of discretion in the case at bar.

Counsel is in error in his statement to the Court in his brief that no testimony is in the record where the defendant referred to his wife and the woman in the car with her as a "lisbian girl friend or somethin of that sort". We would suggest that counsel *read* his client's statement which was introduced as States Exhibit #19 (and which counsel refers to many times), as defendant's own statement was with reference to "this Lesbian girl friend of hers."

We will go to defendant's fourth proposition of error: (and leave number three to be discussed last) That the trial court erred in its instructions to the jury.

This Court has carefully read and considered the trial court's instructions *as a whole*, and find that they correctly and adequately state the law applicable to the

case. Further, no objections were made to the instructions at the time they were given; nor were any instructions offered by defendant. It is the opinion of the Court that the instructions given were quite favorable to the defendant.

Defendant's third proposition of error deals with the Motion for New Trial, and that the trial court erred in denying said motion.

This Court cannot help but comment on the voluminous and immaterial evidence that was permitted to be introduced at the Motion for New Trial—the biggest portion being simply a re-hash of the testimony at the original trial. And the expense that Oklahoma County paid for the preparation of this record on the Motion for New Trial. There were over 128 pages of subpoena's which had no meaning for the purpose of this appeal, and should have been deleted.

The trial judge allowed too much leniency on admission of the same facts and testimony of many of the witnesses.

The only witnesses who testified to facts not in evidence in the first trial were the defendant's wife; Dena Davis, and a friend, Joe Bostick. All could have been secured at the original trial. The testimony of Joe Bostick would be colored by the fact that he is a long time friend of the defendant's and that he had been convicted of a felony. Defendant's wife's testimony was merely corroborating one point on her husband's story, and the balance of her testimony was that she had fabricated a charge of assault many times against her husband and had him picked up each time she got mad at him. Further that her husband is on bail on the charge of theft by bailee in Amarillo, Texas. *This testimony could be very detrimental to defendant.* Further, her record with the Oklahoma City Police Department for vagrancy and prostitution would be considered.

Dena Davis, the friend of Mrs. Walters, testified that Coreen Walters had tried to get her to change her testimony, and had even threatened her regarding it. She further testified that she accompanied Mrs. Walters to the police station and saw her sign the complaint against her husband. She stated that Walters was very jealous of her friendship with his wife, and that he had threatened her.

It was the duty of the trial court to weigh all of the evidence presented at the Motion for New Trial, and it was his decision that the alleged new points covered were available at the time of trial, and that it would hurt the defendant more than it would help him if a new trial were to be held.

The granting of a new trial on the ground of newly discovered testimony is a matter largely within the trial court's discretion and is not to be exercised except where there is reasonable probability that, if such evidence had been introduced, different results would have been reached. See, England v. State, Okl.Cr., 276 P.2d 270; Tobler v. State, 87 Okl.Cr. 25, 194 P.2d 202.

This Court held in the case of Mitts v. State, Okl.Cr., 345 P.2d 913:

"Where evidence is urged by defendant on a motion for new trial on the ground the same is newly discovered, it must be established that the same, if existing at the time of trial, could not have been procured before trial by the exercise of due diligence, and failure to do so constitutes a bar to a new trial on such ground. [Title 22, O.S.A. § 952.]"

See Armstrong v. State, 61 Okl.Cr. 352, 68 P.2d 114; Henderson v. State, 94 Okl. Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292, certiorari denied 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673.

Under the above rule, the defendant is precluded from taking advantage of the evidence he did not use and which the record shows was available to him at the trial on the merits. To approve defendant's contention now asserted would open up a new artifice in criminal defense by

which a defendant could play fast and loose with the courts.

We do not believe that the defendant was poorly represented at his trial by the public defender, Mr. Don Anderson. It is abundantly clear to this Court that Mr. Anderson conducted himself and the defense of his client in a careful and intelligent manner —securing a much lesser degree of Assault on the conviction. He conducted himself throughout the trial as a lawyer skilled in criminal law.

After a careful consideration of this entire record now before us, it is the opinion of this Court that the jury's findings on the facts are conclusive, and the principles of law which support this conviction are well established.

It is therefore the opinion of this Court that the judgment and sentence of the trial court is hereby affirmed.

BUSSEY, P. J., and BRETT, J., concur.